UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60215-CIV-SEITZ/SIMONTON

FLEXITEEK AMERICAS, INC. and
FLEXITEEK INTERNATIONAL AS,
        Plaintiffs,
vs.

PLASTEAK, INC. and PLASDECK,
INC.,
        Defendants.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court on Defendants Plasteak, Inc. and Plasdeck Inc.'s ("Plasteak") motion for summary judgment. [DE 196]. This is a patent infringement case. Plaintiffs Flexiteek Americas Inc., and Flexiteek International A.S. ("Flexiteek") own U.S. Patent 6,985,881 ("the '881 patent") for a "Shape Conforming Surface Device." Plasteak makes and sells extruded floor coverings principally used on the decks of yachts and boats that simulate teak and other exotic woods. Flexiteek alleges that Plasteak, an industry competitor, willfully, directly and indirectly infringed the '881 patent. Flexiteek also alleges that Plasteak violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") by deceptively posting on Plasteak's website that the Patent and Trademark Office had rejected the '881 patent.

Having carefully considered the motion, Plaintiff's opposition [DE 217], reply [DE 226], and the record, summary judgment must be granted for Defendants on all counts. As to the allegations of infringement, summary judgment must be granted because no reasonable juror could find the accused devices have "longitudinal slots," a limitation of each of the re-examined '881 patent's claims. As to the FDUTPA claim, summary judgment is warranted because Plaintiffs have not offered any evidence of causality between Plasteak's allegedly deceptive statements and Flexiteek's claimed damages.

## I. BACKGROUND[1]

### a. *The Accused Device*

Plasteak makes and sells extruded plastic planks that are assembled into deck coverings for boats and yachts. The advantage of PlasTEAK[2] over the exotic woods typically used to cover boat decks is that PlasTEAK is more durable and requires much less upkeep. The planks are inherently flexible and are sold in rolls that are cut to the deck's specification, either by the "do it yourself" boat owner or a professional installer. The accused devices differ from each other by color, finish, edge structure, and the presence of simulated caulking lines.[3]

### b. *Litigation History and Re-Examination of the '881 Patent*

This is the second time Flexiteek has sued Plasteak for infringement of the '881 patent. In the first case a jury found Plasteak had infringed the patent and awarded Flexiteek $79,632.00 in damages. *Flexiteek Americas, Inc. et al. v. Plasteak, Inc., et al.*, Case No. 08-60996-CIV-COHN/SELTZER ("*Flexiteek I*"), [DE 158]. Judge Cohn, who presided over the earlier case, also entered a Permanent

---

[1] Unless otherwise noted the facts are derived from the undisputed record evidence.

[2] As it is used here, PlasTEAK is the trade name of the accused devices.

[3] Problematically, not all of the products described in the record have an identified product number. The accused devices are described in detail at three places in the record. The first place is in Plaintiffs' expert's report [DE 196-1] and declaration [DE 218-3]. Plaintiffs' expert, Dr. Frank Jones, discuss two sets of the accused devices. The first set he considered contained fifteen samples. He described some of these by model name, but others he only described by appearance. [218-3, ¶4]. The second set contained eleven samples. All of these were identified by product number. *Id.* at ¶3. The extent to which products from the two groups overlap is unclear. The second place in the record where the accused devices are described in detail is in the exhibit attached to the affidavit of Defendants' CEO, William Gribble. [DE 196-2]. This exhibit contains multiple close-up photographs of what Gribble claims is the entire product line. [DE 196-2]. This group consists of eleven products. Notably, these are the same as the eleven products as the second set Dr. Jones examined. Finally, some of the accused devices are pictured in the exhibits cataloguing the samples submitted in consideration of the motion [DE 248] and in opposition [DE 247]. Defendants submitted twelve product samples. Eleven of these are the same products from the Gribble affidavit and the expert's second sample set. The twelfth sample, E-601, is a discontinued glow-in-the-dark sample. Plaintiffs submitted two samples in conjunction with their opposition. Neither is identified by product number. The first is titled "Metallic Series Gold with Black Lines." The second is identified only with a sticker marked Defendant's Exhibit No. 19.

Plaintiffs contend that there is a genuine disputed material issue of fact as to which product lines the products described in the record belong to. [DE 217, p. 10]. The matter is immaterial because none of the products described in the record infringes the '881 patent.

Injunction. [*Id.* at DE 212]. On July 20, 2009, about three weeks after the entry of final judgment in *Flexiteek I*, Plasteak filed a third-party request for reexamination with the United States Patent and Trademark Office ("PTO") on grounds that the patent examiners did not consider material prior art in the '881 patent's initial prosecution. [DE 77-5, p. 124].

As it originally issued, the '881 patent had a single claim. Pursuant to Plasteak's third-party request for reexamination, the PTO rejected this claim on anticipation and obviousness grounds. The office action was dated January 29, 2010. Thereafter, Flexiteek sought to amend claim 1 and to add 28 new claims to the patent. The PTO examiner found claims 2 – 28 patentable but again rejected Claim 1 for anticipation and obviousness. The Board of Patent Appeals and Interferences affirmed the rejection of Claim 1 in a written decision but only on anticipation grounds. A Certificate of Reexamination issued on December 6, 2011, containing claims 2 – 28. In an order issued October 31, 2012, Judge Cohn vacated the Final Judgment and Permanent Injunction in *Flexiteek I* reasoning that because the patent's date of enforcement started on the date of amendment Plasteak was not liable for infringement of an unenforceable patent. [DE 308, p. 4, 08-60996-CIV-COHN/SELTZER].

### c. *Plasteak's Published Statements Concerning the Litigation and Reexamination*

Plasteak published several posts on its website related to *Flexiteek I* and the reexamination. Among these were a February 8, 2010 entry titled "January 29, 2010 U.S. Patent Office Rejects the Whitaker Patent Used by Flexiteek," which stated:

> Upon re-examination of this patent, the U.S. Patent Office has rejected patent #6,895,881 (the " '881 Patent") on two counts with the conclusion that the patent does not provide sufficient parameters to demonstrate any uniqueness or originality of their product when compared to earlier patents. The rejection of the '881 Patent means that Flexiteek no longer has a valid U.S. Patent to infringe upon! [DE 196-1, ¶15].

Additionally, Defendants issued a press release via their website which analogized the litigation to "David versus Goliath" and claimed Plaintiffs were "a massive and wealthy multi-national corporation," which had "some impressive and expensive lawyers." [DE 218, ¶62].

3

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251-52)).

## III. INFRINGMENT

"Patent infringement, whether literal or by equivalence, is an issue of fact, which the patentee must prove by a preponderance of the evidence." *Siemens Med. Solutions USA, Inc. v. Saint–Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011). Resolving infringement claims is a two-step process. *North Am. Container Corp. v. Plastipak Packaging, Inc.*, 415 F.3d 1335 (Fed. Cir. 2005). First, the Court must construe genuinely disputed claim terms as a matter of law. Here, three terms were disputed – "longitudinal slots," "interconnected," and "tightly curved." The Court defined those terms in its previously issued Claims Construction Order. [DE 178]. Second, the fact finder compares the construed claims to the accused device. Infringement can only be found if every claim or an equivalent is found in the accused device. "Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *U.S. Philips Corp. v. Iwasaki Elec. Co. Ltd.*, 505 F.3d 1371, 1374–75 (Fed. Cir. 2007).

## IV. SUMMARY JUDGMENT MUST BE GRANTED FOR DEFENDANTS ON INFRINGMENT (CLAIMS I – III)

Because the longitudinal slots limitation applies to every claim of the reexamined '881 patent,[4] Defendants' motion for summary judgment on non-infringement presents a discrete threshold issue – whether, based on the record evidence, a rational trier of fact could find that there are longitudinal slots on the underside of the accused devices.[5] The Court previously defined the term "Longitudinal Slot" as follows:

> Grooves spaced relatively close together that run parallel to each other for the length of the planks or sheet, wherein the grooves have a depth and width of a material percentage of the planks' or sheets' thickness such that the grooves materially increase the ability to curve and the surface area for adhesion. [DE 178, p. 8].

Juries in patent cases are instructed that that they must apply the court's construction of claim terms in their deliberations. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2005) (internal citation omitted). Here, when asked to review the definition of "longitudinal slot" and explain what it describes, a reasonable juror could only describe a plank with an obvious series of undulating ribs and valleys at its underside. The Court notes at the outset that none of the accused devices contain such a

---

[4] The term "Longitudinal Slots" appears in cancelled Claim 1 and all of the independent claims of the re-examined '881 patent: Claims 9, 12, 15, 18, 22, and 27. Because the longitudinal slots limitation applies to all of the independent claims, it applies to all 28 claims of the patent. The term "Interconnected" appears in cancelled Claim 1 and independent Claims 9, 12, 15, 18, and 27. The term "Tightly Curved" appears in independent Claims 9, 12, 15, 18, and 27 and dependent Claims 2, 26, and 28. [DE 1-7, pp. 3-5].

The terms "male connection members" and "female connection members" appear in independent Claim 22 and dependent Claim 3. Defendants have argued that these features are not present in any of the accused devices. [DE 196, p. 9]. Plaintiffs counter that the shiplap edge connection of products E-521, E-522 and E-600, among possibly others, is male/female connection. [DE 217, p. 4]. This edge structure is explained at greater length in section IV(c) *infra*, but generally, certain planks have an "L"-shaped recess running the entire length of their sides. These planks were intended to abut a plank with an overhang running the entire length of its side. Though the terms "male connection members" or "female connection members" were not construed, no reasonable juror could find that the side edge of these products is a male/female connection as those terms are commonly understood. *See Phillips V. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.")

[5] Plaintiffs incorrectly assert that Defendants, as moving party, must prove that "all of its products" do not have longitudinal slots. [DE 217, pp. 9 – 10]. To prevail, Defendants only need to show the lack of a genuinely disputed material issue of fact in the record evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Here, based on the undisputed record evidence, the law entitles Defendants to summary judgment.

5

structure. Despite the absence of obvious ribs, Plaintiffs nonetheless contend that all of the accused devices, except one,[6] infringe because in their expert's opinion at least four different types of recesses meet the definition of longitudinal slots. Each recess type, which Plaintiffs' expert labels microstructural, under caulking strip, side edge, and between caulking lines and plank, is discussed in turn below. However, having reviewed the record evidence, which included inspecting 13 different samples of PlasTEAK, the Court must conclude that even when all reasonable factual inferences are resolved in Flexiteek's favor, no reasonable juror could find that any of the accused devices have the longitudinal slots limitation and therefore must grant summary judgment on infringement to Defendants.

    a.  *"Microstructural Recesses"*

Plaintiffs claim that there are microstructural recesses on the underside of all the accused devices with the sole exception discussed in note 6. Microstructural striations are inherent in extruded polymer-based products. [*See* DE 218-3, ¶¶ 9 – 10 ]. In his report, Plaintiff's expert Dr. Jones roughly estimates there were between 50 and 100 ridges and valleys per inch on one sample he observed, meaning that each recess on the sample has a width of one-fiftieth (1/50) to one-one-hundredth (1/100) of an inch.[7] [DE 196-1, ¶22]. Longitudinal slots are "grooves that have a depth and width of a material percentage of the plank's . . . thickness." Applying this definition, no reasonable juror could find that recesses of such miniscule dimension could be longitudinal slots.

Plaintiffs also argue that because the microrecesses on the accused devices are equivalent structures of the longitudinal slots described in the '881 patent, the accused devices infringe under the doctrine of equivalents.[8] Under the doctrine of equivalents "[a]n element in the accused product is

---

[6] Plaintiff's expert concedes that the product designated "FLOROTHL Teak+Holly Mat Finish does not contain any longitudinal slots. [DE 218-3, ¶9]. This product is the only one not manufactured by Plasteak.

[7] By way of comparison, the samples the Court reviewed were generally either 2 inches or 6 inches wide and about two-tenths (2/10) of an inch thick. Individual grooves on the underside of the samples were indiscernible to the touch; the undersurface of the samples was either smooth or more akin to the texture of sandpaper as opposed to ribbed.

[8] Unlike the Plaintiffs other equivalence arguments (discussed at note 11 *infra*), the equivalence argument on microrecesses is not foreclosed because of a Rule 26 violation since Dr. Jones raised the equivalence of microrecesses at his deposition [DE 196 – 1, p. 187] and Defendants had the opportunity to rebut the argument.

6

equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Eagle Comtronics, Inc. v. Arrow Comm. Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002). The test for equivalence is whether the accused structure performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed invention. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997).

Here, however, Plaintiffs are estopped from claiming equivalence of these structures because the patent owners took essentially the opposite position in the re-examination to secure patentability over the Kemerer *et al*, reference.[9] Specifically, Plaintiffs' reexamination expert Dr. Rhee opined that the novelty of the '881 patent was the addition of longitudinal slots to the underside of the planks and that this addition of the slots or ribs, which "mimicked the structure" inherently present through extrusion of polymers, enabled the tight curving which secured patentability over the prior art. [*See* "Declaration of Dr. C.K. Rhee, Ph.D." DE 77-4, p. 21] ("The addition of these longitudinal slots creates the ability of the sheet or plank to curve around tighter and tighter curves, where the more inherent flexibility of the material would only allow curvature over very slight or gradual curves.") Where the patent owner abandons a more expansive claim for a more limited one in order to avoid the prior art, the patent owner is estopped from later claiming that which he necessarily abandoned is equivalent and infringes. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 734–35 (2002).[10] Accordingly, Flexiteek cannot now claim that the inherent microstructural recesses enable tight curving in a manner substantially similar to longitudinal slots.

  b. *Recesses Under the Artificial Caulking Strips*

Plaintiffs next contend that a depression that runs under the artificial caulking strips of

---

[9] U.S. Patent No 4,290,248.

[10] Despite having been on notice of potential prosecution history estoppel at least since after Defendants filed their answer [DE 9, ¶78; *See also* Transcript of Technology Tutorial, DE 141, p. 32], Plaintiffs have not attempted to rebut estoppel under the *Festo* framework. 535 U.S. at 740 ("Just as *Warner-Jenkinson* held that the patentee bears the burden of proving that an amendment was not made for a reason that would give rise to estoppel, we hold here that the patentee should bear the burden of showing that the amendment does not surrender the particular equivalent in question.")

7

certain models is a longitudinal slot. [DE 218-3, ¶13(i)].  Utilizing an electron micrograph to measure the depressions of one specimen, Dr. Jones concluded the depressions are three one-thousandths (0.003) of an inch deep.[11]  This accounted for a depth of one-third to one-fourth *of one percent* of the planks' 0.17 inch thickness.  If asked to apply the longitudinal slot claim construction to these measurements, no reasonable juror could conclude that these depressions are "grooves have a depth and width of a material percentage of the planks' or sheets' thickness."  Plaintiffs have also argued equivalence citing Dr. Jones's opinion that cumulating the effect of these slots across multiple joined planks would materially increase the ability to curve and the surface area for adhesion.  However, because this opinion was not properly disclosed, that evidence is not before the Court and the argument is otherwise unsupported.[12]

    c.  *Recesses on the Side Edges*

Certain PlasTEAK products have "L"-shaped notched edges such that the top of the plank overhangs the bottom.[13]  Plaintiffs contend that the resulting groove, which accounts for about fifty

---

[11] Dr. Jones claimed that such slots were located on the underside of samples E-522 and E-603.  The Court reviewed these samples and notes that the depressions Dr. Jones describes were both visually and tactilely indiscernible.  Depressions of the kind Jones describes were faintly discernible on the sample marked Def. Exib. 19 [DE 247 – 2], however, no reasonable juror could find that these depressions are sufficiently material in width and depth to be considered longitudinal slots.

[12] Dr. Jones's declaration was dated September 16, 2013, the same day Plaintiff filed its opposition and roughly one month after the agreed upon discovery cutoff date. [DE 29, p. 2].  In his declaration Dr. Jones opines that cumulating the recesses present at the underside of the caulking line, or on the side edges, or between the caulking strip and plank across several joined planks or sheets accomplishes substantially the same result as the longitudinal slots of the patent. [*See* DE 218-3, ¶13(ii), et. seq.]  Plaintiffs rely on these opinions to argue that the cumulated effect of these structures is equivalent to longitudinal slots. [DE 217, pp. 12 – 14].

    Within their reply brief, Defendants move to strike Dr. Jones's declaration based on non-compliance with Fed. R. Civ. P. 26. [DE 226, pp. 3 -4].  Defendants correctly note that the purpose of Rule 26 disclosures is to prevent ambush.  *Rembrandt Vision Tech's, L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (11th Cir. 2013) ("The purpose of the expert disclosure rule is to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.") (internal quotation and citation omitted).  With discovery concluded and motions for summary judgment pending, Defendant did not have the opportunity to redepose Dr. Jones on the substance of his new opinions, consult its own expert to assist in determining the validity of the opinions, or marshal new rebuttal evidence.  To the extent that Plaintiffs claim that Dr. Jones could not have formed his equivalence opinions until Defendants disclosed additional product samples on August 22, 2013, the argument is unavailing.  Dr. Jones inspected samples with each of the four features described in his declaration in advance of his deposition, but did not offer any opinion on equivalence (save for microrecesses) until his declaration.   The measurements of the product samples made in the declaration, though not raised at Jones's deposition, are assumed objective and have been considered, as were any of Dr. Jones's opinions that Defendant had a fair opportunity to rebut. [*See e.g.,* Note 8 *supra*].

[13] Plaintiffs claim that numbered samples E-521, E-522, E-600 Teak, E-602, E-603, E-605, and E-607 have this

8

percent (50%) of the plank's thickness and four and a half percent (4.5%) of the width of a six inch plank or nine (9%) of the width of a two inch plank, is a longitudinal slot. [DE 218-3, ¶13(iv)]. The contention overlooks the requirement that longitudinal slots be spaced relatively close to one another. By definition, the structure Plaintiffs argue is a slot is separated from the next closest structure by at least the entire non-edge part of the plank, which would account for 91% of the total distance of a 2 inch plank and 97% of the total distance of a 6 inch plank.[14] As such, a reasonable juror could not find these recesses are spaced "relatively close together."[15]

   d.  *Recesses Between Caulking Line and Plank*

Plaintiffs' final contention is that the space between the caulking line and body of the material of certain PlasTEAK products is a longitudinal slot.[16] [DE 218-3, ¶13(vii)]. Plaintiffs argument here fails for a combination of reasons its previous arguments do. First, the dimension of the slots is immaterial relative to the size of the plank. For example, Dr. Jones measures the width of one such groove to be two-

---

feature. [*See e.g.,* DE 196, p. 21].

[14] This calculation applies only to where the notched edge feature occurs on both longitudinal sides of the plank, which Plaintiffs call a T-Edged Plank. Where the T-Edge Plank feature occurs only on one side of the plank, as Plaintiff argues could be the case [DE 218-3, ¶13(v)], the distance between grooves would necessarily be greater.

[15] Plaintiffs also claim that when two planks with this edge feature are abutted, the distance between the "slots" is less than half an inch. However, the integral unit of the '881 patent's surface covering is the individual plank or sheet, as evidenced by the language of Claim 1 which states in relevant part: "the planks or sheet are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and acting as a base for glue." As the 881 patent's file history confirms, the inventor intended for each plank to be enabled to be laid in tightly curved formations:

> "The inventor ... greatly enhanced the degree of flexibility that would have been inherent to the material itself by adding a series of longitudinal slots and/or ribs in a very tight pattern on the underside of *the plank or sheet*. The addition of these longitudinal slots creates the ability of the *sheet or plank* to curve around tighter and tighter curves, where the mere inherent flexibility of material would only allow curvature over very slight or gradual curves." ["Declaration of Dr. C.K. Rhee, Ph.D." DE 77-4, p. 21] (emphasis added).

As such, the relevant dimension for the closeness of the slots is the distance between slots on the same plank or sheet, not the distance between a slot on one plank and the slot on its neighbor.

[16] Dr. Jones claims the "Metallic Series Gold with Black Lines" [DE 247-1], product E-521 [DE 196-2, p. 26], and another undesignated sample have this feature.

9

hundreds of an inch (0.02), or 1% of the sample's two-inch width.[17] *Id.* Like the recesses beneath the caulking strip described above, no reasonable juror could find a groove of this dimension material. Second, only one such groove is described as being present on the sample. For the reasons discussed in note 14 *supra*, the Court's definition of longitudinal slots implicitly requires more than one slot to be present on a single plank. As such, even if the structure that Plaintiff has described met the materiality requirement, it fails to meet the plurality requirement.

## V. SUMMARY JUDGMENT MUST BE GRANTED FOR DEFENDANTS ON FDUTPA CLAIM (CLAIM IV)

Plaintiffs allege that Defendants published deceptive statements on their website between February 2010 and February 2012 and that these statements ultimately caused Plaintiff to lower its prices to keep domestic distributor clients.[18] Plaintiffs claim the publication violated FDUTPA, which makes "[u]nfair metiods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce..." unlawful. FLA. STAT. §501.204(1) (2011). To state a FDUTPA claim, Plaintiffs must allege (1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages. *Macias v. HBC of Fla. Inc.*, 694 So.2d 88, 90 (Fla. 3d DCA 1997). Causation between the deceptive act or trade practice and the damages must be direct rather than remote or speculative. *Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354, 1361 (S.D. Fla. 2012). Summary judgment on a FDUTPA claim is warranted where the record evidence fails to support the element of causation. *Dolphin LLC v. WCI Communities, Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013).

In 2010 Flexiteek had to reduce its prices to Original Equipment Manufacturers ("OEMs") and distributors leading to a loss of revenue. [Declaration of Tom Jacques, DE 218-1, ¶¶ 8 - 9; Declaration of

---

[17] A picture of this groove taken with a scanning electron microscope is attached to Dr. Jones's declaration. [218-3, p. 53]. The Court also inspected this sample and notes that it is imperceptible with the naked eye.

[18] The allegedly deceptive statements are as follows: (1) omission of the fact that the January 29, 2010 PTO Office Action was preliminary and not final; (2) that Defendants did not infringe the '881 patent; (3) Plaintiffs are a massive, wealthy multinational corporation and are Goliath to Defendants' David; (4) Plaintiffs had expensive attorneys; (5) and that the removal of the injunction allowed Defendants to sell internationally. [DE 217, p. 17 – 19].

Tomas Gustafsson, DE 218-2, ¶¶ 15 – 16 ]. Both Jacques, Flexiteek's U.S. subsidiary's CEO and Gustafson, the CEO of a Flexiteek subsidiary in Sweden, state that Plasteak's website posts caused Flexiteek's to lower its prices. The record contains several emails between Flexiteek's sales staff and its OEM's and distributors that confirm that Flexiteek did in fact cut its sales prices as to these distributors. However, this is no record evidence of communications between Flexiteek and a third party that mentions Plasteak's website, the Reexamination proceedings, the validity of the '881 patent, or the *Flexiteek I* litigation.[19] Aside from Jacques and Gustafson's conclusory statements, the record is devoid of causality evidence to support, even as a threshold matter, that Plasteak's statements caused Flexiteek's price cuts. Based on the record evidence, a reasonable juror could be no more likely to conclude that Plasteak's statements caused the Flexiteek's loss of revenue more than, for example, the general downturn in the economy, the entry of new market competitors, or technological advancements by a rival.

To defeat summary judgment there must be a sufficient showing that the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Here, the lack of record evidence on the causation element precludes such a showing. Plaintiffs have argued that a jury *could* infer causality based on the alleged deception and damages alone. [DE 217, p. 20]. However, Plaintiffs have cited neither a scintilla of actual evidence to support such an inference, nor any case law which would support the proposition that the direct causality element of a FDUTPA claim could be proven by inference alone. As such, because a jury could not find for Plaintiffs as a matter of law, summary judgment for Defendants is warranted.

## VI.   CONCLUSION

For the foregoing reasons, it is

---

[19] Gustafson also states he had to correct Plasteak's statements to "preserve client relationships." As evidence, Plaintiff attached e-mails between Gustafson and a representative of a company called Nuteak. On September 13, 2011 the Nuteak representative wrote: "We were told that Plasdeck and Tek Dek will be out of the market and after 3 years, Plasdeck is still very active Tek Dek also in Canada. We were again told that your patent was revoked and the chance to be re-activated (sic.) were slim. Is that true?" [DE 218 – 1]. The Nuteak representative made no mention of Plasteak's website, did not identify the patent at issue, did not name his source, or explain how the questionable validity of the '881 patent would impact Nuteak. There is also no record evidence to suggest that Flexiteek cut its sales price to Nuteak. Gustafson replied to the Nuteak email with a statement from Flexiteek's lawyer stating that ultimately Flexiteek reached an "incredible result" in its dealings with the PTO. The attorney's statement never mentioned any comment Plasteak made or cited any posts from Plasteak's website. Id.

ORDERED THAT

(1) Defendants' Motion for Summary Judgment [DE 196] is **GRANTED**. The Court will separately enter Final Judgment for Defendants.

(2) All pending motions except Plaintiffs' Motion for Sanctions [DE 186] are **DENIED AS MOOT.**

(3) The parties are directed to retrieve their product samples, and courtesy copies of briefing, exhibits, and file histories from chambers by **December 4, 2013**.

(4) The **CASE IS CLOSED.**

DONE AND ORDERED in Miami, Florida, this 2nd day of December, 2013.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: Honorable Andrea M. Simonton
All counsel of record

12