**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 12-60215-CIV-SEITZ/SIMONTON**

**FLEXITEEK AMERICAS, INC.,
And FLEXITEEK INTERNATIONAL
AS,**

      **Plaintiffs,**

**v.**

**PLASTEAK, INC., and
PLASDECK, INC.,**

      **Defendants.**

_____/

<u>**REPORT AND RECOMMENDATION
ON DEFENDANTS' VERIFIED RENEWED MOTION
FOR ATTORNEYS' FEES AND COSTS AND
AMENDED BILL OF COSTS**</u>

      This matter is before the Court upon the Defendants' Verified Renewed Motion for Attorneys' Fees and Costs, ECF No. [285] and Defendants' Amended Bill of Costs, ECF No. [273]. The Plaintiffs have filed an Opposition to Motion, ECF No. [290] and the Defendants have filed a Reply, ECF No. [293]. The Honorable Patricia A. Seitz, United States District Judge, has referred these matters to the undersigned United States Magistrate Judge, ECF Nos. [29] [271]. For the reasons stated below, the undersigned recommends that the Defendants' Verified Renewed Motion for Attorneys' Fees be Granted, in part, and Defendants' Amended Bill of Costs be Granted, in part, and that Defendants be granted $211,514.45 in Attorneys' Fees and $4,488.40 in costs, for a total of $216,002.85 in fees and costs.

      I.    <u>**INTRODUCTION**</u>

      This action involves infringement claims under the patent laws of the United States and claims under the Florida Deceptive and Unfair Trade Practices Act

("FDUTPA") related to the sales of a synthetic teak decking product used on marine vessels.  The specific issue currently before this Court is whether the Defendants, whose products were determined by this Court to be non-infringing at the summary judgment stage, are entitled to an award of attorneys' fees based upon their contention that this is an "exceptional" case under the Patent Act, 35 U.S.C. § 285, and/or based upon their contention that such an award is warranted under FDUPTA.  Defendants argue that this case is exceptional because the Plaintiffs' infringement allegations were objectively baseless from the inception of this action.  The Plaintiffs, on the other hand, contend that an award of attorneys' fees is not warranted because this case is not exceptional and the Plaintiffs brought and prosecuted their claims in good faith.

Based upon the totality of the circumstances, and the record as a whole, the undersigned concludes that this case became exceptional once the Plaintiffs continued to pursue their infringement claims after the Court issued its Order on Claims Construction on July 16, 2013.   The undersigned therefore recommends that the Defendants be awarded their attorneys' fees, in part, incurred in this action after that date.  In addition, the undersigned finds that the Defendants are entitled to recover their fees incurred for defending against the FDUTPA claims, as well.  Finally, the Defendants, as a prevailing party, are entitled to recover their costs incurred in this matter.

## II.   BACKGROUND

### A.   Prior '881 Patent Litigation and Patent Re-Examination

Before the Plaintiffs filed the instant action, the same Parties, Flexiteek America, Inc., and Flexiteek International AS ("Flexiteek" or "Plaintiffs") and Plasteak, Inc., and Plasdeck, Inc., ("Plasteak" or "Defendants"), litigated another patent infringement action involving the same synthetic teak decking material at issue in this case.  *See Flexiteek Americas, Inc., et al. v. Plasteak, Inc., et al.*, Case No. 08-60996-CIV-COHN/SELTZER ("*Flexiteek I*").  In *Flexiteek I,* the Parties disputed whether the Defendants' products

2

infringed upon a patent held by Flexiteek for a "Shape Conforming Surface Covering" designated U.S. Patent No. 6,895,881, ('881 Patent).  That Patent consisted of a single claim—Claim 1.

In *Flexiteek I*, a jury found that the Plasteak Defendants' products had infringed the '881 Patent and awarded Flexiteek $79,632.00 in damages.  On that same date, the Honorable Judge Cohn, the District Judge who presided over that case, held a bench trial on the Defendants' affirmative defense of inequitable conduct on the part of the Plaintiffs. *Flexiteek I* at ECF No. [143] .  That defense was predicated upon Defendants' contention that Plaintiffs had intended to deceive the United States Patent and Trademark Office ("PTO") in obtaining the '881 Patent by failing to disclose material prior art related to that Patent, as well as, failing to disclose that the Intellectual Property Office of New Zealand ("IPONZ") had revoked a similar patent held by the Plaintiffs based upon that prior art.  *Flexiteek I,* at ECF No. [297] at 2.  Judge Cohn found that the Defendants had failed to clearly and convincingly establish that the Plaintiffs intended to deceive the PTO.  On July 3, 2009, the Court entered a Final Judgment against the Defendants.

Approximately two weeks after the Final Judgment was entered in that action, the Plasteak Defendants sought *ex parte* reexamination of the '881 Patent by the PTO, See *Flexiteek 1*, ECF No. [174] at 18.

While the Defendants' reexamination request was pending, in a September 15, 2009 Omnibus Order the Court ruled on the Parties' Post-Trial Motions. *Flexiteek 1*, ECF No. [174].  In that Order, the Court noted that the '881 Patent provided that the synthetic planks "are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and for acting as a base for a glue or adhesive."  *Flexiteek 1*, ECF No. [174] at 6.  The Court observed that the key factual question in that case centered on

the underside of the Plaintiffs' and the Defendants' products and summarized the

Parties' positions in the case as follows:

> Defendants argued that their products did not infringe the
> '881 Patent because the bottom of their products were
> smooth and did not contain longitudinal slots.  Plaintiffs
> argued that Defendants' products, when examined closely,
> did contain longitudinal slots even though they were not as
> deep as the recesses found on the bottom of Plaintiffs'
> products.

*Id.* at 6-7.   The Court further noted that the Defendants asserted that the longitudinal

structures, as opposed to slots, found on the bottom of the Defendants' products were a

natural result of the PVC extrusion, and could not support a claim of literal infringement.

*Id.* at 7.   The Court stated that the Defendants' arguments had been presented to and

rejected by the jury, and thus concluded that there was sufficient evidence to support the

jury's infringement verdict at trial, based upon the "text of the '881 Patent, expert

testimony, samples of Plaintiffs' and Defendants' products, magnified photographs of

such products, and several additional witnesses." *Id.*  The Court, however,

acknowledged that "the question of whether Defendants' products contain 'longitudinal

slots' as defined by the '881 Patent [was] a close call." *Id.*   The Court then denied the

Defendants' Rule 50(b) Motion and granted the Plaintiffs' Motion for a Permanent

Injunction.  The Court stayed the Final Judgment and Permanent Injunction pending the

final reexamination of the '881 Patent, *Flexiteek 1*, ECF No. [231].

On or about April 21, 2010, upon reexamination, a PTO Examiner rejected Claim 1

of the '881 Patent as being anticipated by certain prior art, ("Kemerer prior art"), the

same art that had been cited as the basis for the IPONZ revocation, *Flexiteek 1*, ECF No.

[297] at 7.[1]  On Appeal, the Board of Patent Appeals and Interferences, ("BPAI") affirmed

---

[1]  **The entire Prosecution History File Wrapper of the Ex Parte Reexamination of the '881 Patent has been filed into the record in the case at bar.** *See Flexiteek, et al., v. Plasteak Inc., et al.,* No. 12-60215-CIV-SEITZ, ECF No. 77.

the rejection of Claim 1 as anticipated by Kemerer prior art. ECF No. [297] at 7-8, [288-3] at 2.[2]  In that opinion, the BPAI observed that Claim 1 does not recite any limits on the dimensions of the longitudinal slots, *Flexiteek 1*, ECF No. [288-3] at 24.  However, the BPAI accepted Flexiteek's expert, Dr. Rhee as qualified to testify about the properties of the elastomers at issue, *Flexiteek 1*, ECF No. [288-3] at 18.  The BPAI ultimately canceled the '881 patent and Claim 1 contained in that Patent, and on December 6, 2011, issued a Reexamined Patent for Claims 2-28 for the application and use of the "Shape Conforming Surface Covering", *Flexiteek 1*, ECF No. [288-3] at 1.[3]  It is that Reexamined Patent that is at issue in the case currently before the Court.

After the Reexamined Patent issued, the Defendants in the prior litigation moved for Relief from Judgment seeking to have the permanent injunction, money judgment and orders premised on the validity of the patent vacated, *Flexiteek 1*, ECF No. [297] at 9.  The Court granted the request, and on October 31, 2012, vacated the Permanent Injunction and Final Judgment, as well as the Claims Construction Order, *Flexiteek 1*, ECF No. [308] at 7.  On February 11, 2013, the Court entered an Order Denying Defendants' Motion for Liability For Attorneys' Fees wherein the Court concluded that the case was exceptional under 35 U.S.C. § 285 due to the Plaintiffs' discovery violation related to Plaintiffs' knowledge of the prior art cited by IPONZ, but nonetheless declined to award attorneys' fees because the Plaintiffs' actions did not prejudice the proceedings, nor delay the resolution of the case, *Flexiteek 1*, ECF No. [328] at 16, 17.

---

[2]  The BPAI reversed the determination of the PTO examiner that rejected Claim 1 on other grounds.  Specifically, the Patent Examiner also found the '881 patent invalid due to the prior art of Baldwin, Stucky and Muller.

[3] The Claims contained in the Reexamined Patent consisted of both claims that were dependent and independent of Claim 1 of the original '881 Patent.

**B.      Procedural History of the Reexamined Patent Litigation
In the Case at Bar**

The matter currently at bar was initiated on February 9, 2012, when Flexiteek filed

a Complaint against Plasteak alleging Willful Direct Patent Infringement and Willful

Indirect Patent Infringement, both pursuant to 35 U.S.C. §§ 271, and further alleged

violations of the Florida Deceptive and Unfair Trade Practices Act pursuant to Florida

Statute § 501.201, *et seq.*, *Flexiteek, et al., v. Plasteak, et al.*, No. 12-60215-CIV-SEITZ,

("*Flexiteek II*"), ECF No. [1].  In the Complaint, the Plaintiffs alleged that the Defendants

"make, sell and retain profits" from products which infringe upon a reexamined patent

("reexamined '881 patent") for a teak wood decking alternative material held by the

Plaintiffs which was issued by the PTO.  Plaintiffs sought relief in the form of "lost

profits, other economic damages, and the amounts to which Defendants have been

unjustly enriched," "a reasonable royalty on the Accused Products and other infringing

items, made, used, sold or offered for sale by Defendants," and "disgorgement of the

profits received by Defendants." ECF No. [1] at 13.  In addition, the Plaintiffs sought

temporary and permanent injunctive relief restraining and enjoining the Defendants from

continuing to infringe upon the Plaintiffs' reexamined '881 patent.

The Plaintiffs further alleged that the Defendants made false statements on the

Defendants' website regarding the Patent held by the Plaintiffs and the proceedings

before the PTO related to that Patent, ECF No. 1 at 7-8.

In their Answer, the Defendants denied the allegations in the Plaintiffs' Complaint

and asserted, *inter alia,* the affirmative defenses of "Unenforceability" based upon the

inequitable conduct of the Plaintiffs in the procurement of the patent, and "Invalidity" of

the patent based upon the failure of the patent to comply with the requirements of the

patent laws of the United States including, 35 U.S.C. §§ 102, 103 and 112, ECF No. [9].

6

The litigation between the Parties was contentious, necessitating multiple discovery hearings, and an evidentiary hearing on a Motion for Sanctions. Ultimately, the Defendants were granted summary judgment on the Plaintiffs' infringement and FDUPTA claims, ECF Nos. [254], [256]. On December 3, 2013, the Court entered Final Judgment in favor of the Defendants, ECF No. [256]. The Final Judgment was affirmed on appeal by the United States Court of Appeals for the Federal Circuit Court, ECF No. [282].

The Defendants' Verified Renewed Motion for Attorneys' Fees and Costs, ECF No. [285] and Defendants' Amended Bill of Costs followed, ECF No. [273].[4] The following facts are relevant to the resolution of the pending Motions.

### The Claims Construction Briefing and Order

In their initial respective Claims Construction briefs, the Parties disagreed, among other things, about the number of terms in dispute. Upon review of the Parties' claims construction briefs, the Court determined that the Parties had failed to effectively assist the Court in construing the claims of the reexamined patent, ECF No. [132]. Accordingly, on May 29, 2013, the Court entered an Order Striking Plaintiffs' and Defendants' Markman Briefs, which struck the Parties' Claims Construction briefs, postponed the Markman hearing and directed the Parties to confer and file a Joint Statement of Claims Construction, ECF No. [132]. The Parties were directed to model their joint statement after that filed in *Flexiteek I*, with the Parties identifying no more than ten claims construction terms which were genuinely disputed.

In the Joint Claims Construction Statement, the Parties indicated that they disputed the terms, "Longitudinal Slots", "Tightly Curved", and "Interconnected" in

---

[4] The Defendants previously filed a Verified Motion for Attorneys' Fees and Costs, ECF No. [274]. That Motion was denied without prejudice with leave to re-file once the Plaintiffs' appeal of the Court's Final Judgment to the Federal Circuit was resolved, ECF No. [278].

determining whether the patent at issue had been infringed, ECF No. [136].  Each Party submitted their proposed definitions of the terms in dispute.   With regard to the term "Longitudinal Slots," the Parties noted that the term was essential to the case as the Defendants asserted that their product lacked recesses that were of substantial depth such as those shown in the diagrams of the '881 patent, ECF No. [136] at 2.  The Plaintiffs, on the other hand, contended that the term "Longitudinal Slots" had previously been given a well-reasoned definition in the previous litigation between the Parties, and thus asserted that that term was not genuinely in dispute, [136] at 3.

On June 6, 2013, the Court held a technology tutorial in order to assist the Court in understanding the materials and structure at issue in the case, ECF Nos. [138] [141].  Thereafter, the Court, with the Parties' assent, determined that a Markman hearing was unnecessary, and directed the Parties to file a supplemental Joint Claims Construction Statement, ECF No. [140] at 2.  In that Supplemental Joint Claims Construction Statement, the Plaintiffs offered the following proposed definition for "Longitudinal Slots":

> Recesses that extend in the direction of the length of the planks or sheet that forms a volume sufficient to (1) facilitate curving and (2) provide a surface connection by means of glue or adhesive material to a surface being covered.

ECF No. [148] at 2.  The Defendants proposed the following alternative definitions:

> Multiple recessed groves spaced relatively close together, in relatively equal parallel distance to each other for the length of the panel or sheet, wherein the grooves have a depth of approximately 25 to 75 percent of the material thickness, and width at the underside of approximately 25 percent of the material thickness, increasing the ability to curve and increasing surface area for adhesion.
>
> Or,
>
> Multiple recessed grooves spaced relatively close together, in alternating, relatively equal, parallel grooves and ridges, for the length of the panel or sheet, wherein the grooves have a depth and width of a material percentage of the material

> thickness such that, in combination, they materially increase
> the ability to curve and increase surface area for adhesion.

ECF No. [148] at 2.

The Court issued its Claims Construction Order on July 16, 2013 wherein the

Court defined, "Longitudinal Slots" as:

> Grooves spaced relatively close together that run parallel to
> each other for the length of the planks or sheet, wherein the
> grooves have depth and width of a material percentage of the
> planks' or sheets' thickness such that the grooves materially
> increase the ability to curve and the surface areas for
> adhesion.

ECF No. [178] at 6.[5]  In concluding that the above definition of "Longitudinal Slots" was

appropriate, the Court noted that the Parties agreed that the correct definition should

refer to the functions of facilitating the planks' curvature and for serving as a base for

glue or adhesive, ECF No. [178] at 2.  In addition, the Parties agreed that the definition

should refer to the slots in the plural and should describe the slots as running the length

of the plank or sheet. *Id.*  However, the Parties disagreed as to whether any other

limitation should be added to the term, with the Defendants urging additional limitations

as to the relative spacing of the slots, as well as, the depth and width of the slots, ECF

No. [178] at 2.

As to the relative slot spacing, the Court first determined that a person with

ordinary skill in the art who read the '881 Patent and who was familiar with the file

history, would understand that the Reexamined Patent Claims, which were dependent

upon Claim 1 of the '881 Patent, taught parallel-running, longitudinal slots spaced

---

[5] The Order on Claims Construction also defined the terms "Interconnected" and "Tightly
Curved", ECF No. [178] at 6-8.  However, the dispositive ruling in this case centered on
the definition of "longitudinal slots," ECF No. [255] at 5.  Accordingly, the Report and
Recommendation only addresses the merits of the Plaintiffs' claims on that term.

relatively close together, even though that spacing was not discussed in the claim language, ECF No. [178] at 3.[6]

In reaching this determination, the Court observed that several of the figures in cancelled Claim 1 that displayed the slot-configurations, exhibited that the slots ran parallel to each other, were spaced relatively close together and were equally apart, ECF No. [178] at 3. *(See Figs. 1, 6, 11, below)*.



*Fig. 1*



*Fig. 6*

---

[6] As discussed, *supra*, although Claim 1 of the '881 Patent was cancelled by the PTO, the Reexamined Patent, at issue in this case, consists of Claims that are dependent upon Claim 1 in their definition.



*18*                    *19*

## Fig. 11

The Court concluded that such an observation was consistent with the

Declaration of Dr. C.K. Rhee, the expert used by the Plaintiffs during the reexamination of

the '881 patent process.[7]  The Court thus concluded,

> One skilled in the art would understand that to achieve tight
> curving with only the use of glue or adhesive, the primary
> advancement of the invention, the longitudinal slots should
> run parallel to each other and be spaced in a close-together
> pattern.  As such, the claim as construed will include
> language that reflects this configuration.

ECF NO. [178] at 3.  Similarly, the Court agreed with the Defendants that an additional

limitation of depth and width should be included in the definition of longitudinal slots.

As stated by the Court, "Here, it is especially important that the depth and width of the

slots be included in order to capture the essence of the invention because the invention

---

[7] Dr. Rhee's Declaration was submitted by the Defendants in this action as part of the
Prosecution History File Wrapper of the Ex Parte Reexamination of the '881 Patent, ECF
No. [77].

taught by the '881 patent is an exaggeration of a 'natural' condition." ECF No. [178] at 4.

The Court continued with, "The invention of the '881 patent is the addition of longitudinal

slots to the underside of the plank or sheet which enable the plank or sheet to be laid in

tightly curved formations and affixed only with glue or adhesive." ECF No. [178] at 4.

Most significantly, the Court quoted from Dr. Rhee's Declaration that was submitted in

support of the Plaintiffs' claims before the PTO during the patent reexamination process,

and stated:

> As described above, the inventor of the '881 patent was
> aware that the extrusion process aligned the molecules in the
> direction of the extrusion which resulted in an 'extended
> longitudinal structure' that adds 'an extra degree of flexibility
> along the axis that is slightly greater than the degree of
> flexibility that is inherent in the material itself.'  His
> inventiveness was recognizing that by mimicking these
> molecular  arrangements by slotting the underside of the
> plank, one could achieve flexibility well beyond what was
> yielded by extrusion alone.  The addition of these longitudinal
> slots 'represents the true innovation of this patent which is
> novel and patentable.'

ECF No. [178] at 4.  Finally, the Court stated "Defendants' second definition appropriately

captures the distinction between the slots claimed in the '881 patent and the molecular

formations 'naturally' yielded by extrusion." ECF No. [178] at 5.   The Court, however, in

examining the Plaintiffs' contention that the "prosecution history disclaime[d] size-

based limitations" regarding the depth and width of the longitudinal slots, nevertheless

deemed the Plaintiffs' contention "worthwhile, but misplaced." ECF No. [178] at 6.  The

Court acknowledged that the PTO's statements in the reexamination, regarding the

immateriality of the size of the longitudinal slots were in response to the Plaintiffs'

attempt to differentiate the invention over the prior art, ECF No. [178] at 6.  Thus, the

Court concluded that the '881 Patent taught that the relative depth and width of the slots

were an enhancement over the molecular structures formed incident to extrusion, ECF No. [178] at 6. [8]

### *Summary Judgment Briefing and Order*

A little more than a month after the Court issued its Order on Claims Construction, the Defendants filed their Motion for Summary Judgment, ECF No. [196], and the Plaintiffs moved for Partial Summary Judgment as to Defendants' "Failure to State a Claim Defense," Third, Fourth and Fifth Affirmative Defenses, and Standing, ECF No. [197].

On December 3, 2013, the Court issued an Order granting Summary Judgment to the Defendants, ECF No. [255].  In that Order the Court stated the following, "As to the allegations of infringement, summary judgment must be granted because no reasonable juror could find the accused devices have 'longitudinal slots,' a limitation of each of the re-examined '881 patent's claims." ECF No. [255] at 1.  Regarding the absence of longitudinal slots in the Defendants' products, the Court noted that the Plaintiffs' expert in the case, Dr. Frank Jones, contended that the "microstructural recesses" in the Defendants' products met the definition of longitudinal slots, ECF No. [255] at 6.  The Court observed that Dr. Jones admitted that microstructural striations were inherent in

---

[8] The Plaintiffs appealed the Court's Claims Construction definition of "longitudinal slots" to the Federal Circuit Court of Appeals. *See Flexiteek Americas, Inc. v. PlasTEAK, Inc.,* No. 14-1214, (Fed. Cir. 2014).  On April 28, 2015, the Appellate Court affirmed the trial court's Claims Construction Order and stated, "We conclude the district court properly construed the term 'longitudinal slots' in light of both the intrinsic and extrinsic evidence.  The patent's specifications provides two illustrations of the longitudinal slots, figures 1 and 6.  In both of these figures the longitudinal slots are depicted as being evenly spaced and running the length of the material.  There is no other reference in the patent specification that provides an alternative definition or illustration of the longitudinal slots.  Furthermore, while the figures do not specify exact depth ranges for the longitudinal slots, they do show that the slots have a non-insignificant depth." ECF No. [282] at 9.  The reviewing Court cited Plaintiffs' expert Dr. Rhee's statements in the reexamination proceedings as support for the trial court's definition of "longitudinal slots."  Finally, the reviewing Court also agreed with the trial court's conclusion that the Defendants' products did not meet the definition of "longitudinal slots" as defined by the trial court.

extruded polymer-based products, and rejected Dr. Jones' opinion that recesses with a width of one-fiftieth to one-one-hundredth of an inch could be considered longitudinal slots, ECF No. [255] at 6.

The Court also rejected the Plaintiffs' contentions that the micro-recesses contained in the Defendants' products met the definition of longitudinal slots under the doctrine of equivalents.  The Court rejected this argument because, in the reexamination proceedings, the Plaintiffs, through their then-expert Dr. Rhee, took a contrary position and contended that the novelty of the '881 patent was the addition of longitudinal slots to the underside of the planks as distinguished from the structure inherently present through the extrusion process, ECF No. [255] at 7.  The Court also rejected the Plaintiffs' contention that the three one-thousandths of an inch deep recesses under the artificial caulking strips in the Defendants' products, discernable through the use of an electron microscope, met the requisite depth and width of the "longitudinal slots" definition in the Claims Construction Order, ECF No. [255] at 8.  Finally, the Court concluded that the Defendants' products did not meet the "relatively close together" and plurality requirements of the Claims Construction definition for "longitudinal slots." ECF NO. [255] at 8-9.

As to the FDUPTA claim, the Court concluded that summary judgment was warranted because the Plaintiffs failed to offer any evidence of causality between the Defendants' allegedly deceptive statements and the Plaintiffs' claimed damages. Specifically, the Court  stated that Plaintiffs had not cited "a scintilla of actual evidence" to support that Plaintiffs' claim that the allegedly false statements made on the Defendants' website had cause damage to the Plaintiffs, ECF No. [255] at 11.  As such, the Court concluded that no jury could find for the Plaintiffs as a matter of law.

II.   **POSITIONS OF THE PARTIES**

A.   **Defendants' Request for Attorneys' Fees**

In the Defendants' Verified Renewed Motion for Attorneys' Fees and Costs, the Defendants contend that they are entitled to recover their reasonable attorneys' fees and costs in the amount of $641,917.10, incurred in defending this action, ECF No. [285]. Specifically, the Defendants contend that pursuant to 35 U.S.C. § 285, they are entitled to recover their fees on the Plaintiffs' patent infringement claims because this is an "exceptional" case.  The Defendants argue that the Plaintiffs' patent infringement claims were objectively baseless and were brought in subjective bad faith.  The Defendants further contend that they are entitled to recover their fees under the Florida Deceptive and Unfair Trade claims because, among other things, the Plaintiffs' FDUPTA claims were frivolous, ECF No. [285] at 8.

The Defendants also contend that the amount of the Attorneys' Fees and costs are reasonable given the contentious nature of this litigation.

B.   **Plaintiffs' Opposition**

In opposition to the Defendants' request for Attorney's Fees, the Plaintiffs contend that this case is not exceptional because the Plaintiffs' filing and prosecution of this action were not in bad faith.  The Plaintiffs acknowledge that the United States Supreme Court has recently expanded and/or lowered the standard for awarding attorney's fees in patent cases upon a finding that a case is "exceptional," but the Plaintiffs maintain that the Defendants have failed to produce evidence that this case was frivolous or objectively unreasonable or vexatious, and thus contend Defendants are not entitled to attorney's fees, even under the new standard.

In support of their position, the Plaintiffs assert that in the prior patent case before Judge Cohn involving the '881 Patent, the Plaintiffs received a jury verdict in their favor against the same Defendants in this case.  Thus, although the Plaintiffs acknowledge that

15

the '881 Patent was ultimately vacated by the PTO, they maintain that the Claims Construction Order issued by Judge Cohn in that case set forth the same definition of "longitudinal slots" that the Plaintiffs suggested be adopted in this case.

The Plaintiffs also argue that this action was not brought in bad faith and that Plaintiffs' counsel conducted an adequate pre-filing investigation prior to filing this suit, ECF No. [290] at 9. In support of this contention, the Plaintiffs have submitted the Affidavit of Scott D. Smiley, Esq., a registered Patent Attorney who was retained by the Plaintiffs in early 2012, ECF No. [290-2]. The Affidavit provides that prior to filing the instant litigation, Mr. Smiley performed a thorough investigation of the original litigation between the Parties, including examining specimens of Defendants' products, and the original '881 Patent and the Reexamined Patent and their respective prosecution histories, ECF No. [290-2]. Mr. Smiley states that he examined samples of Defendants products that the jury determined infringed on the original '881 Patent and compared them to Defendants' current products and concluded that those products were substantially the same. He also concluded that the scope of the Reexamined '881 Patent did not vary significantly from the scope of Claim 1 of the original '881 Patent. He therefore concluded that the holders of the Reexamined '881 Patent would be able to successfully prove infringement. Thus, the Plaintiffs contend that the decision to assert infringement of the Reexamined '881 Patent was made on a good faith basis, which in large part was based on the previous result of the original litigation.

III.    "EXCEPTIONAL" CASE ATTORNEYS' FEE AWARD

A.    Legal Framework

The Patent Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

In 2014, the Supreme Court considered the showing required for an award of fees pursuant to 35 U.S.C. § 285. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct.

1749, 1756 (2014). The Court first rejected the test adopted by the Federal Circuit in *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005), which required a prevailing party to establish that, absent misconduct during litigation or in securing the patent, the litigation was brought in subjective bad faith and was objectively baseless when filed. *Id.* at 1576. The Court instead concluded that the prevailing party must only demonstrate that the case "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* The Court then opined that whether a case is exceptional is to be determined on a case-by-case basis, considering the totality of the circumstances. *Id.* Although evidence of bad faith is not necessary, the Court recognized that a case presenting either subjective bad faith *or* exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award. *Id.* at 1757. The Court also held that a party must prove its entitlement to fees under § 285 by a preponderance of the evidence, rather than by clear and convincing evidence which had been previously required by the Federal Circuit. *Id.* at 1758.

Recently, the Federal Circuit noted the significance of the Supreme Court's holding in *Octane* and stated:

> [U]nder the new *Octane Fitness* standard ... the Supreme Court did not simply relax the standard under § 285. It substantially changed the analysis. The district court may now consider the totality of the circumstances to determine whether this case is 'exceptional,' and the district court is not necessarily required to find evidence of the specific factors outlined in *Brooks Furniture*. Further, the Supreme Court lowered the burden of proof for establishing that a case is 'exceptional.'

*Intellectual Ventures I LLC, v. Capital One Financial Corp. et al.,* No. 1:13cv0740 (AJT/TCB), 2015 WL 7283108, *4 (citing *AdjustaCam, LLC v. Newegg, Inc.*, 2015 WL 5449927, *3 (Fed. Cir. Sept. 17, 2015)). Courts have generally recognized, however, that

17

while the bar a prevailing party must clear to establish an 'exceptional' case has been lowered, an award of fees under 35 U.S.C. § 285 involves litigation conduct that goes beyond mere stonewalling, excessive discovery demands, or otherwise burdensome litigation strategies. *Id.*   As the Supreme Court observed, it is 'the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees. *Id.* (citing *Octane Fitness*, 134 S. Ct., at 1757).  Further, there exists a "presumption that the assertion of infringement of a duly granted patent is made in good faith." *Taurus IP, LLC v. Dairnler-Chrysler Corp.,* 726 F.3d 1306, 1326-27 (Fed. Cir. 2013) (quoting *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.,* 393 F.3d 1378, 1382 (Fed. Cir. 2005).

A case may considered exceptional if the claims advanced by a litigant are objectively baseless. *Vehicle Interface Tech., LLC., v. Jaguar Land Rover North*, No. 12-1285-RGA, 2015 WL 9462063, *1, (D. Del. 2015) (citing *Taurus IP, LLC v. Dairnler-Chrysler Corp.,* 726 F.3d 1306, 1327 (Fed. Cir. 2013)).  To be objectively baseless, the patentee's assertions—whether manifested in its infringement allegations or its claim construction positions—'must be such that no reasonable litigant could reasonably expect success on the merits.' " *Taurus IP,* 726 F.3d at 1327 (citing *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008)).  Thus, a case may be declared exceptional if a plaintiff relies on a claim construction that is so lacking in evidentiary support that it is objectively unreasonable or indicates bad faith. *Vehicle Interface Tech., LLC., v. Jaguar Land Rover North*, No. 12-1285-RGA, 2015 WL 9462063, *1, (D. Del. 2015); *See Taurus IP, LLC v. Dairnler-Chrysler Corp.,* 726 F.3d 1306, 1327 (Fed. Cir. 2013) ("When patentees have sought unreasonable claim constructions divorced from the written description, ... court[s] ha[ve] found infringement claims objectively baseless."); see also *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 919 (Fed. Cir. 2012)

("[Plaintiffs] proposed claim construction was so lacking in any evidentiary support that assertion of this construction was unreasonable and reflects a lack of good faith.").

    **B.**   **Analysis**

        **1.**  **Objective Baselessness of Plaintiffs' Claims and Claims Construction**

As set forth above, the Defendants contend that the Plaintiffs' patent infringement claims were objectively baseless from the outset of the case. Specifically, Defendants assert that the Plaintiffs' theory that the Defendants' products contained "longitudinal slots" which infringed upon the Plaintiffs' Reexamined Patent was wholly unsupported by the record as evidenced by the Court's ruling on Summary Judgment.

At the outset, the undersigned notes that in this case, the determination of whether the Plaintiffs' infringement claims were baseless when this action was filed is complicated by the fact that prior to the filing of the instant action, the Parties litigated the same infringement claims based on the original '881 Patent. As noted above, although Claim 1 of the '881 Patent was subsequently cancelled, it served as the basis for the claims in the Reexamined Patent at issue in this case.[9] Claim 1 of the '881 Patent included the term "longitudinal slots" which were described as, ". . . longitudinal slots at the underside thereof for facilitating forming of curved coverings and for acting as a base for a glue or adhesive material. . ." ECF No. [1-3] at 11. Thus, Claim 1 of the cancelled '881 Patent did not specify the size, length or depth of the longitudinal slots but rather only provided that the slots must be: 1) on the underside of the surface; 2) facilitating forming of curved coverings; and 3) acting as a base for a glue or adhesive material.

---

[9] Claims 2-28 of the Reexamined Patent either are dependent claims that incorporate by reference the now-canceled Claim 1 of the '881 Patent, or otherwise include the term "longitudinal slots."

Similarly, in addressing the Parties' claims construction disputes, the District Judge who presided over the previous litigation specifically rejected the Defendants' request that the term "longitudinal slots" require limitations on the size and shape of those slots, *e.g.* substantial depth, not formed incidentally to the manufacturing process. *Flexiteek 1*, ECF No. [127] at 2-3.  Rather, the Court defined "longitudinal slots" as "recesses that run the length of the planks or sheets, without limitation of the size or shape of the recesses which both (1) facilitate curving and (2) form a surface connection by means of glue or adhesive material to a surface being covered." *Id*.  Therefore, prior to the Plaintiffs' filing of the instant action, there was no definition of longitudinal slots that required a certain depth or visibility of those slots.  Instead, the longitudinal slots arguably only had to have slots or recesses that facilitated curving and that provided a surface which acted as a base for glue or adhesive material.[10]

It was these requirements that Plaintiffs maintained were met by Defendants' purported infringing products at the outset of this suit.  Indeed, in opposition to the Defendants' request for attorneys' fees, the Plaintiffs contend that the pursuit of their infringement claims was reasonable, in part, because the '881 Patent does not expressly provide a limitation or requirement on size or depth of the longitudinal slots. Further, the Plaintiffs, through their expert, have maintained that the absence of *any* material in the form of a longitudinal slot would inherently make the material easier to curve and thus would meet one of the requirements of the definition of longitudinal slots, ECF No. [196-1] at 177.  This was the position advanced by the Plaintiffs prior to the Claims

---

[10]  It is worth noting that in their Markman Hearing Brief that was stricken by the Court, the Plaintiffs suggested that the Court herein adopt the definition that had been adopted by the District Judge in the prior litigation, ECF No. [61] at 6. Such language would arguably remove the Defendants' products from meeting that definition because even the Plaintiffs' experts did not describe the recesses in Defendants' products as running the length of the planks or sheets. In the Supplemental Joint Claims Construction Statement, the Plaintiffs offered another definition that did not require that the longitudinal slots run the length of the plank, ECF No. [148] at 2.

Construction Order through the testimony of Dr. Frank N. Jones, Plaintiffs' expert, at his May 24, 2013 deposition, ECF No. [196-1].  At that deposition, Dr. Jones testified as follows:

Q:     And it's your opinion that if there was any variation in the thickness of the material across the plank, that could constitute a slot?

A.     Yes.

Q:     And that could be as small as 10 nanometers, would that qualify for you?

A:     If you could detect it.

ECF No. [196-1] at 183.

Q:     So it's your opinion that any marking at all, no matter how minor the length is, how minor the width is and how minor the depth is, that constitutes a longitudinal slot that would affect the ability to curve and therefore be an infringing slot; is that your opinion?

Mr. Johnson: Objection to form.

A:     Yes.

ECF No. [196-1] at 185.  Dr. Jones then answered a series of questions about photographs taken by an electron microscope which magnified the Defendants' sample product 500x, ECF No. [196-1] at 184, 291.[11]  At the deposition, Dr. Jones was unable to determine the length, width, height or depth of the "slots" that Dr. Jones had previously identified in those photographs as being sufficient to meet the definition of "longitudinal slots" as defined in the '881 Patent, ECF No. [196-1] at 184, 185, 291.   Upon further questioning, Dr. Jones also admitted that he was unable to see the longitudinal recesses in one of the samples of the Defendants' products with the naked eye, ECF No. [196-1] at 266.  Thus, based upon the express language of the Reexamined Patent, as well as the

---

[11] The Defendants' expert eventually examined more than twenty of the Defendants' products for infringement.  For purposes of this Report and Recommendation, any structural or other variances in those products is not relevant.

definition of "longitudinal slots" in the prior litigation, the Plaintiffs contend that their claims for patent infringement in this case were brought in good faith and were objectively reasonable, ECF No. [290].

However, the reasonableness of Plaintiffs' reliance on the definition of "longitudinal slots" from the prior '881 litigation is somewhat undermined by the record. First, Judge Cohn's Claims Construction Order which defined "longitudinal slots" was specifically vacated after the original '881 Patent was cancelled and when the Defendants' Motion for Relief from Judgment in that case was granted, *Flexiteek 1*, ECF No. [308] at 7.  Second, although Judge Cohn declined to award attorney's fees to the Defendants in that case, he nonetheless concluded that the case was "exceptional" under § 285 based upon Plaintiffs' counsel's litigation misconduct related to the Plaintiffs' failure to timely disclose its knowledge of the prior art related to the underlying '881 Patent, and the Plaintiffs' representation to the Court that the '881 Patent was markedly different than the New Zealand patent that had been revoked several years earlier based upon prior art.[12]  Further, it is questionable whether the position taken by the Plaintiffs in this case regarding the definition of longitudinal slots would have even satisfied Judge Cohn's definition in the prior case because it is clear that the microstructural slots pointed to by Plaintiffs' expert in this case, do not run the length of the planks, and thus would not satisfy that definition.[13]

---

[12]  To be clear, the undersigned does not rely on any of the facts surrounding the Plaintiffs' alleged conduct before the PTO in regard to the '881 Patent to assess the validity of the Plaintiffs' infringement claims, herein.  Rather, the Court's reference to those proceedings is solely for the purpose of providing the procedural context for the case at bar, and the Parties' understanding of the definitional terms of the '881 Patent when this action was filed.

[13] In *Flexiteek I*, Plaintiffs offered a varied definition from Judge Cohn's which left out "recesses that run the length of the planks or sheets." Such language would arguably remove the Defendants' products from meeting that definition because, even the Plaintiffs' experts did not describe the recesses in Defendants' products as running the length of the planks or sheets.

Further, as pointed out by Defendants, Plaintiffs' own expert, Dr. Rhee argued that it was the very presence of the longitudinal slots that differentiate Claims 2-28 of the Reexamined Patent from the canceled Claim 1 of the '881 Patent.  In this regard, the case is akin to *Cartner v. Alamo Group, Inc.*, 561 F. App'x 958, 963 (Fed. Cir. 2014).  In that case, the PTO had previously rejected the patent at issue as anticipated by several other patents.  In order to overcome that rejection, the patentee added a particular limitation to the patent in order to distinguish the patentee's product from the other patents.  The reviewing Court therefore affirmed the district court's conclusion that it was objectively unreasonable for the patentee to then assert that the defendant's product met that limitation where the defendant's product was similar to those patents that were distinguished by the patentee in regard to that very limitation. *Id.* at 963-64.

Finally, although the Plaintiffs argue that their Counsel performed an adequate pre-filing investigation based, in large part, on the prior litigation, the Plaintiffs' contention fails to explain or account for how the Reexamined '881 Patent differed from the original '881 Patent in relation to the Defendants' products.  In other words, although the Defendants' products and the Plaintiffs' products may have remained virtually the same in both actions, the Plaintiffs did not state what pre-filing investigation was conducted given the proceedings before the PTO for the Reexamined '881 Patent, and whether the Defendants' products could reasonably be considered to infringe upon that newly defined Patent.

Despite these observations, for the following reasons, the undersigned is constrained to conclude that the Plaintiffs' initial pursuit of this action, including Plaintiffs' suggested claims construction, was not objectively baseless.  First, as correctly noted by the Plaintiffs, the '881 Patent and the definition of "longitudinal slots" arrived at by the PTO and the District Judge in the prior litigation, did not include any limitation as to the depth or width of the longitudinal slots, and did not specifically limit

the slots to those other than those inherent in the extrusion process.[14]  In addition, although the District Court in *Flexiteek I* ultimately vacated the final judgment and claims construction order in that case, the Order doing so was not entered until more than eight months after the instant action was filed.  Accordingly, the undersigned is unable to conclude that "no reasonable litigant could reasonably expect success on the merits" at the outset of this case.

More importantly, in the Order on Claims Construction, the Court in this case expressly stated that the Plaintiffs' contention that no definitional size-based limitation applied to longitudinal slots was "worthwhile, but misplaced." ECF No. [178] at 6.  Again, such a finding precludes the Court from finding that the Plaintiffs relied on a claim construction that is so lacking in evidentiary support that it is objectively unreasonable or indicates bad faith.

Thus, although this is a close call, the undersigned is unable to conclude by the preponderance of the evidence that the Plaintiffs' pursuit of the infringement claims were objectively baseless at the outset of this action, or at the time that the Plaintiffs submitted their proposed claims construction.

2. Plaintiffs' Conduct After the Claims Construction Order

While an adverse claim construction generally cannot, alone, form the basis for an exceptional case finding, a party cannot assert baseless infringement claims and must continually assess the soundness of pending infringement claims, especially after an adverse claim construction. *Taurus IP, LLC v. Damler Chrysler Corp.* 726 F.3d, 1306, 1328 (Fed. Cir. 2013) (citing *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme*, 603 F.3d 943, 954 (Fed. Cir. 2010)).  The salient inquiry is whether the

---

[14]  The undersigned recognizes that the PTO's rejection of any size-based limitation on "longitudinal slots" was based upon the expansive, e.g. obviousness nature of the Kemerer prior art, rather than the expansive nature of Plaintiffs' claimed Patent.

plaintiff's claims are so lacking in merit that the plaintiff was legally obligated either to abandon its case altogether or to limit itself to challenging the district court's claim construction order on appeal. *Medtronic Navigation, Inc.*, 603 F.3d at 954. Further, independent of a finding that a plaintiff's claims are lacking in merit, "[a] case can be found exceptional when a party prolongs litigation in bad faith." *Taurus IP*, 726 F.3d at 1328. Similarly, a case may be shown to be exceptional if the non-prevailing party engages in litigation misconduct, which includes advancing frivolous argument during the course of litigation or otherwise prolonging litigation in bad faith. *Cartner v. Alamo Group, Inc.*, 561 F. App'x 958, 963 (Fed. Cir. 2014) .

In this case, any doubt as to whether such infringement claims were baseless at the outset of this case was removed once the Court issued it Claims Construction Order on July 16, 2013. This is so because it became absolutely clear at that point that the structure of the Defendants' purported infringing products did not and could not meet the Court's definition in that Order. Specifically, as set forth above, the Order on Claims Construction provided the following definition for "longitudinal slots:"

> Grooves spaced relatively close together that run parallel to each other for the length of the planks or sheet, wherein the grooves have depth and width of a material percentage of the planks' or sheets' thickness such that the grooves materially increase the ability to curve and the surface areas for adhesion.

ECF No. [178] at 6. Despite this definition, the Plaintiffs continued to press their infringement claims after the Order on Claims Construction was issued, ECF No. [178]. In their Response to the Defendants' Motion for Summary Judgment filed by Plaintiffs two months later, the Plaintiffs contended, *inter alia*, that there remained a genuine issue of material fact as to the whether the Defendants' products contained longitudinal slots, ECF No. [217]. In that filing, the Plaintiffs explained that their expert, Dr. Jones, in his expert report, asserted that the "grooves depicted in the micrographs are of a depth and

width, and that the accumulation of microstructural recesses found in Defendants'
products has a substantial effect on curving and adhesion," ECF No. [217] at 11.  The
Plaintiffs noted that at the time of Dr. Jones' initial expert report, the Parties were without
the benefit of the Court's Claims Construction Order, but Plaintiffs nevertheless
contended that Dr. Jones' finding of infringement by Defendants' products applied
literally and under the doctrine of equivalents.  Pursuant to the latter of these theories,
the Plaintiffs explained that the recesses in the Defendants' products met the definition
of longitudinal slots because the cumulative effect of "thousands of grooves in the
planks operate in substantially the same way to accomplish substantially the same result
as the Court's definition for longitudinal slots…". ECF No. [217] at 12.  The Plaintiffs
further argued that, pursuant to Dr. Jones' Report, the Defendants' products contained
other longitudinal slots beneath the artificial caulking strips, on the side edges, and
between the caulking strips and body of the products.

In addition, in further support of their Opposition to the Defendants' Motion for
Summary Judgment, the Plaintiffs submitted the September 16, 2013, Declaration of
Frank Jones, which was signed after the Court issued its Claims Construction Order,
ECF No. [218-3].  In that Declaration, Dr. Jones asserted that twenty-five (out of twenty-
six) of the Defendants' sample products contained longitudinal slots as defined by the
Court in the Claims Construction Order, ECF No. [218-3] at 5.  In addition, Dr. Jones
referenced photographs of one of the Defendants' sample products and concluded that
the microstructural image of the underside of that product indicated the presence of
"grooves that extend in the same direction" that are "substantially equidistant from each
other," when viewed at 200x magnification, ECF No. [218-3] at 5.  In the Declaration, Dr.
Jones acknowledged that the Court's definition of longitudinal slots required the grooves
to be of a "material depth and width of a material percentage of the planks' thickness",
ECF No. [218-3] at 6.  Dr. Jones nevertheless posited that this definitional limitation was

met by the Defendants' products, in part, because each of the grooves had a "visible depth and width, based on [his] experience reading and interpreting micrographs generated from scanning electron microscopes." ECF No. [218-3] at 6.

The undersigned concludes, based on the entirety of the record, that following the Court's Order on Claims Construction, it was wholly unreasonable for the Plaintiffs to argue that the Reexamined Patent teaches that all grooves or recesses, no matter how microscopic, short, insignificant in depth, and/or randomly or distantly spaced could constitute "longitudinal slots" as contemplated by that Patent.  It was this very argument that was rejected by the Court in the Claims Construction Order when the Court noted that Figures 1, 6 and 11 of the '881 Patent illustrated that the slots run parallel to each other, are spaced relatively close together and equally apart, ECF No. [178] at 3.  This argument was further rejected when the Court concluded that the Patent required that the slots had to be "material" as opposed to inherent or incidental to the extrusion process, ECF No. [178] at 5-6.  As stated by the Court in its Order Granting Defendants' Motion for Summary Judgment, "no reasonable juror could find that the accused devices have 'longitudinal slots,' a limitation of each of the re-examined '881 patent claims." ECF No. [255] at 1.  Rather, as further stated by the Court in that Order, when asked to explain the definition of a "longitudinal slot" as set forth in Claims Construction Order, "a reasonable juror could *only* describe a plank with an obvious series of undulating ribs and valleys as its underside." ECF No. [255] at 5. (emphasis added). The Court continued its analysis with, "…*none* of the accused devices contain such a structure.  Despite the absence of obvious ribs, Plaintiffs nonetheless contend that all of the accused devices, except one, infringe. . ." ECF No. [255] at 5-6. (emphasis added).

Similarly, it is hard to comprehend how the Plaintiffs' claim that a depression that was determined by the Court to be one-third to one-fourth of one percent of the planks' 0.17 inch thickness could meet the Claims Construction definition of a "material

percentage of the planks'. . . thickness," ECF No. [255] at 8, could be anything but baseless.  Indeed, to the extent that Dr. Jones claimed that slots were located on the underside of certain of the Defendants' samples, the Court, after reviewing the samples, determined that the depressions described by Dr. Jones were both "visually and tactilely indiscernible." ECF No. [255] at 8.   Finally, it is significant that Dr. Jones opined that the microstructural striations were inherent in the [Defendants'] extruded products, ECF No. [255] at 6.  As such, it is hard to fathom how "recesses of such miniscule dimension", such are present in the Defendants' products, could meet the Claims Construction definition of "longitudinal slots". *Id.*

In this regard, the instant case is akin to *Marctec, LLC v. Johnson & Johnson*, 664 F.3d 907 (Fed. Cir. 2012), wherein the reviewing Court affirmed a trial court's determination that a patent infringement case rose to the level of an exceptional case for purposes of awarding attorneys' fees, where the plaintiff pursued baseless and frivolous infringement allegations and acted in bad faith in bringing and pressing the suit when it had no basis for asserting infringement. *Id.* at 914-15.   In so doing, the Court noted that the fact that a litigant loses on summary judgment does not warrant an automatic finding that the suit was objectively baseless. *Id.* at 918.  However, the Court agreed with the district court that the "written description and prosecution histories of the patents-in-suit and other documentary evidence" supported the finding that the infringement case was baseless particularly where the patent holder disclaimed the presence of stents to overcome the prior art, but then claimed the presence of stents formed the basis of the infringement in the defendants' product. *Id.* at 919.   The Court stated, "[b]ecause the specification and prosecution history clearly refute [the plaintiff's] proposed claim construction, the district court did not err in finding that [the plaintiff's] infringement claims were objectively baseless." *Id. Accord*, *Netcraft Corp. v. ebay, Inc.*, 549 F.3d 1394,

1398-1400 (Fed. Cir. 2008); *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1326 (Fed. Cir. 2011).

In addition, the reviewing Court concluded that the district court was correct when it determined that the plaintiff engaged in litigation misconduct by urging the court to adopt "plain meaning constructions of the disputed claim terms" which would require the court to ignore the language in the specification and statements made during the prosecution that directly contradicted the plain meaning arguments it advanced. *Id.* at 920. Further, the reviewing court found that the case was exceptional because, as the district court found, the plaintiff advanced frivolous and unsupported allegations of infringement premised on mischaracterizations of the claim constructions adopted by the trial court and offered expert testimony that did not meet the scientific reliability standards set forth in *Daubert*. *Id.* Thus, the Court concluded that the plaintiff "not only initiated a frivolous lawsuit, it persisted in advancing unfounded arguments that unnecessarily extended th[e] litigation and caused [the defendant] to incur needless litigation expenses." *Id.* at 920-21. Notably, the reviewing court stated that the plaintiff's vexatious conduct was by definition litigation misconduct and provided a separate and independent basis for supporting the district court's determination that the case was exceptional. *Id.* at 921.

The Plaintiffs attempt to distinguish the instant case from *Marctec* by asserting that the plaintiff in that case advanced a claims construction that lacked any evidentiary support and thus was unreasonable, ECF No. [290] at 7. Plaintiffs herein contend that, in contrast to *Marctec*, they set forth a good faith proposed construction of the term "longitudinal slots" and did not attempt to misconstrue the Court's claim construction, or rely on faulty expert testimony. The Plaintiffs urge that the instant action is more akin to *Spectros Corp. v. Thermo Fisher Scientific*, No. C 09-01996 SBA, 2012 WL 5523510, *1 (N.D. Cal. 2012), where a trial court opined that a plaintiff was not required to abandon its

patent infringement claims upon receiving an adverse claims construction order regarding a disputed claim term.  For the following reasons, however, the undersigned concludes that Plaintiffs' reliance on *Spectros Corp.*, is misplaced.  Most notably, *Spectros* was decided prior to the Supreme Court's ruling in *Octane Fitness* and thus required the defendant to demonstrate by "clear and convincing" evidence that the plaintiff's infringement claims were vexatious, unjustified, or frivolous, *and* were pursued in bad faith. *Id.* at *4.   Following *Octane Fitness*, a defendant need only show by a preponderance of the evidence that the plaintiffs' claims were either brought in subjective bad faith or were objectively baseless, or plaintiffs' behavior was independently sanctionable, using a totality of the circumstances test.  In this case, the record demonstrates by preponderance of the evidence that plaintiffs' continued pursuit of the claims after the Claims Construction Order was issued was objectively baseless and was pursued in bad faith.[15]  In addition, the holding in *Spectros* is not binding on this Court or the undersigned.

Further, the undersigned notes that the court in *Spectros* recited the standard set forth by the Federal Circuit Court in *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme*, 603 F.3d 943, 954 (Fed. Cir. 2010) regarding whether a plaintiff should abandon its infringement claims following an adverse claims construction ruling. However, the court in *Spectros* did not address the *Medtronic* reviewing court's emphasis on the fact that the district court's finding that the plaintiff's claims were frivolous was undermined by the fact that the district court denied the defendant's motion for summary judgment and motion for JMOL filed during trial, even after a claims

---

[15] Interestingly, in *Spectros*, the magistrate judge, whose report and recommendation was not adopted by the district judge, found that the defendant had established clearly and convincingly that the case became exceptional once the plaintiff refused to dismiss the action following the court's claims construction order. Thus, it is uncertain how the district judge would rule now under the new lower preponderance of the evidence standard enunciated in *Octane Fitness*.

construction order adverse to the plaintiff was issued.  In contrast, in the case at bar, the trial court granted summary judgment in favor of the Defendants as to all claims.

Finally, in *Medtronic*, the reviewing court concluded that the evidence presented at trial by plaintiff's expert in support of the plaintiff's theory of infringement was sufficient to justify the plaintiff's decision to go forward with that theory at trial, even after the claims construction order. *Id*. at 954, 956-57.  In this case, based upon the Order on Claims Construction and the definition of "longitudinal slots" contained therein, the undersigned is hard-pressed to conclude that the Plaintiffs would have been justified in presenting Dr. Jones' theory at trial regarding how the Defendants' products met that definition.

Thus, while the Plaintiffs are correct that the mere fact that a patentee is unsuccessful in the pursuit of a patent infringement claim does not render a case exceptional, in this case, it is clear that the Plaintiffs' continued pursuit of infringement claims once the Claims Construction Order issued was objectively baseless and frivolous.  In addition, the Plaintiffs' continued pursuit of this action even after the Claims Construction Order prolonged this litigation in bad faith.  Indeed, once the Order on Claims Construction was issued, it is hard to fathom how the Plaintiffs could reasonably expect success on the merits.  The Plaintiffs could have acknowledged that they could not prevail on the merits given the Court's construction and sought an immediate appeal, or otherwise abandoned their claims.  See e.g. *Every Penny Counts, Inc., v. American Express Co.*, 563 F.3d 1378, 1381 (Fed. Cir. 2009) (recounting that after claim construction hearing, plaintiffs admitted that it could not prove infringement based on court's construction and stipulated to entry of final judgment in order to appeal court's construction order); *Abbott Point of Care, Inc., v. Epocal, Inc.*, 908 F. Supp. 2d 1231, 1240 (N.D. Ala. 2012) (stating that claim construction decisions often mark the end of patent infringement case, either by encouraging settlement or prompting immediate appeal by

party who received an unfavorable construction); *Mears Tech. Inc., v. Finisar Corp.*, No. 2:12-CV-376-JRG, 2015 WL 9269423 *1 (E.D. Tex. 2015) (concluding that award of § 285 attorneys' fees not warranted where patent holder conceded that his positions were untenable under claims construction order and stated he was unable to maintain infringement action against defendant). Instead, the Plaintiffs persisted in pursuing their claims by offering expert testimony which the trial court rejected at the summary judgment stage, filing their own Motion for Partial Summary Judgment and seeking sanctions against the Defendants for purported discovery violations, thereby prolonging the instant litigation unnecessarily. Accordingly, under the totality of the circumstances, the undersigned concludes that the Plaintiffs pursued frivolous claims and engaged in bad faith in continuing to pursue their infringement claims.[16]

However, an attorney fees award under § 285 must bear some relation to the extent of the misconduct, so an argument that was frivolous for only part of the litigation must be limited accordingly. *Cartner v. Alamo Group, Inc.*, 561 F. App'x. 958, 963 (Fed. Cir. 2014) (quotations and citations omitted). See also, *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1344 (Fed. Cir. 2001). Similarly, a fee award under § 285 may only "compensate a party for the 'extra legal effort to counteract the [ ] misconduct.' " *Id.* (quoting *Beckman Instr., Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1553 (Fed. Cir. 1989)) (alteration in original). *See also Phonometrics, Inc., v. ITT Sheraton Corp.*, 64 F. App'x. 219, 220 (Fed. Cir. 2003) (affirming portion of district court's order that awarded § 285 attorneys' fees from date of Federal Circuit's order on claims construction where order

---

[16] The undersigned recognizes that Courts frequently distinguish a finding of bad faith based on the pursuit of frivolous claims from a finding of litigation misconduct demonstrating bad faith. However, given the totality of the circumstances in this case, the undersigned concludes that the Plaintiffs' bad faith actions in litigating frivolous claims following the Order on Claims Construction are sufficient for this case to be deemed exceptional. *See e.g. Cartner*, 561 F. App'x, at 969 ("This court need not determine whether this instance of bad faith, standing alone, would adequately support an exceptional case finding. It is sufficient to conclude that the district court did not clearly err in finding this case exceptional under the "totality of the circumstances.")

made clear that plaintiff could not prevail on the merits, yet plaintiff continued to pursue infringement claims, including opposing summary judgment, and took no affirmative steps to end litigation).  Accordingly, the undersigned concludes that this case became exceptional once the Plaintiffs continued to pursue their infringement claims after the Court issued its Claims Construction Order on July 16, 2013.  It is therefore recommended that the Defendants be awarded their attorneys' fees incurred in this action after that date.

V.   **FDUPTA CLAIMS ATTORNEYS' FEE AWARD**

A.   **The Positions of the Parties**

In addition to seeking fees pursuant to the Patent Act, the Defendants assert that they are entitled to recover their reasonable attorneys' fees incurred in defending Plaintiffs' claims brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, ("FDUPTA"), ECF No. [285] at 6.  The Defendants contend that they are entitled to fees because the record demonstrates that the Plaintiffs should not have litigated this case, particularly once it became clear that the Plaintiffs claims were unfounded.

In Response, the Plaintiffs contend that the Defendants have failed to demonstrate that they should be awarded attorneys' fees pursuant to FDUPTA, ECF No. [290] at 12. Specifically, the Plaintiffs contend that the factors that Courts look to in determining whether an award of attorneys' fees under FDUPTA is appropriate, including whether the claims were brought in bad faith, weigh in favor of the Plaintiffs.  The Plaintiffs additionally argue, alternatively, that if the Court finds that an award of fees to Defendants is appropriate, the Defendants should only be entitled to recoup fees for 36.8 hours for a total of $10,347.50 for work that was performed on the FDUPTA claims and not for time spent litigating the other claims, ECF No. [290].  In this regard, the Plaintiffs note that the Defendants failed to separately identify their billing entries that related to the FDUPTA claims.  The Plaintiffs further contend that any award should be reduced by

30% due to unbilled time, block billing and excessive hourly rates, ECF No. [290-3] at 7. Thus, Plaintiffs contend that the Defendants should only be awarded a total $7,243.25, ECF No. [290] at 14.

In their Reply, the Defendants do not address the Plaintiffs' contention that the Defendants failed to separate which of the attorneys' fees incurred were for work done on the FDUPTA claims rather than on the patent claims.  Rather, Defendants assert that Defendants' contention that the Plaintiffs' FDUPTA claims were brought in bad faith is supported by the Court's statements in the Order Granting Defendants' Motion for Summary Judgment, which as set forth above, indicate that the Plaintiffs failed  to provide "a scintilla of actual evidence" that Defendants' statements caused the losses claimed by Plaintiffs.

As recently stated in *Chow v. Chak Yam Chau*, No. 14-14654, 2015 WL 7258668 (11th Cir. 2015) (unpublished), "Under FDUTPA, the Florida Legislature has declared that deceptive or unfair methods of competition and practices in trade and commerce are unlawful." *Diamond Aircraft Indus., Inc. v. Horowitch*, 107 So. 3d 362, 367 (Fla. 2013). "To encourage citizens to invoke the protections of FDUTPA and file actions under that statute, the Legislature has provided that a prevailing party in a FDUTPA action may recover reasonable costs and attorney's fees from the nonprevailing party." *Id.* Thus, "Subsection 501.2105(3) permits an award of attorney's fees for the hours actually expended on a civil action involving a FDUTPA claim." *Id.*

Once a trial court has determined that a party is a prevailing party under FDUTPA, it then has discretion to award attorney's fees and costs after considering various equitable factors, including:

> (1) the scope and history of the litigation;
>
> (2) the ability of the opposing party to satisfy an award of fees;

(3) whether an award of fees against the opposing party
would deter others from acting in similar circumstances;

(4) the merits of the respective positions—including the
degree of the opposing party's culpability or bad faith;

(5) whether the claim brought was not in subjective bad faith
but frivolous, unreasonable, groundless;

(6) whether the defense raised a defense mainly to frustrate
or stall;

(7) whether the claim brought was to resolve a significant
legal question under FDUTPA law.

*Humane Soc'y of Broward Cty., Inc. v. Fla. Humane Soc'y*, 951 So. 2d 966, 97172 (Fla.

Dist. Ct. App. 2007) (citing *Rosen v. Rosen*, 696 So.2d 697, 700–01 (Fla. 1997)). This list is

nonexhaustive. *Id.* at 971.

      B.    <u>Analysis</u>

In this case, the Plaintiffs' FDUPTA claims centered around statements made

about Plaintiffs, their products and their patent on the Defendants' website.  The

undersigned has examined the Plaintiffs' FDUPTA claims and the Court's ruling on the

Defendants' Motion for Summary Judgment.  Based thereon, and in application of the

factors considered by Courts in assessing attorneys' fees pursuant to FDUPTA, the

undersigned concludes that the Defendants are entitled to an award of fees pursuant to

that statute.

As to the first factor, the scope and history of the litigation, the Defendants

contend that this factor weighs in their favor because the Plaintiffs attempted to use their

FDUPTA claims as a "competitive tool" in this long and protracted litigation, rather than

a claim upon which Plaintiffs likely could succeed, ECF No. [285] at 7.  Plaintiffs on the

other hand contend that this factor is neutral in this case where both parties contributed

to the extensive litigation and this is no evidence that the Plaintiffs' claims unreasonably

multiplied the expenses of litigation, ECF No. [290] at 11.  Although the Court did not

reach the issue of the merits of the Plaintiffs' FDUPTA claims regarding the falsity of the statements on the Defendants' website, the Court did ultimately conclude that the Plaintiffs had failed to "cite[ ] a scintilla of actual evidence" to support a showing of damages arising from the Defendants' statements, ECF No. [255] at 11.  However, the bulk of this action centered around the patent infringement cases, and not the FDUPTA claims, thus the scope and history of the litigation is neutral.  Despite their assertions, the Defendants have not demonstrated that the Plaintiffs' FDUPTA claims were brought to "create a chilling effect on Defendants' speech, stifle competition and increase the costs of litigation," or as a "competitive tool," ECF No. [285] at 7.

As to the second factor, the ability of the opposing party to satisfy an award of fees, the Plaintiffs concede that they have to ability to pay, but assert that an award of over $641,000.00 is excessive and would substantially prejudice both Plaintiffs who have been "operating at a financial loss in the United States for several years."  The undersigned concludes that this factor weighs in favor of the Defendants, particularly given that an award pursuant to the FDUPTA claims in this case, would be only for work performed related to the FDUPTA claims—an amount far less than the $641,000.00 referenced by the Plaintiffs.

The third factor, whether an award would deter others from acting in similar circumstances, does not clearly weigh in either party's favor, and thus is neutral.  As pointed out by the Plaintiffs, it is unclear that a FDUPTA award would dissuade a litigant from bringing FDUPTA claims against another competitor for statements made on the competitor's website where the litigant believed that the statements were misleading and observed a decline in sales following the publication of those statements.

As to the fourth and fifth factors, the undersigned has already determined in the analysis regarding the Plaintiffs' infringement claims that the Plaintiffs unnecessarily extended the litigation in this action by advancing meritless claims, and the Court

similarly finds that the Plaintiffs pursuit FDUPTA claims were of little merit.  Specifically, the statements identified in the Complaint relate primarily to the cancellation of the '881 Patent, although a few of the statements identified in the Summary Judgment briefs, discuss the wealth of the Plaintiffs and state that the Defendants did not infringe on the '881 Patent, ECF No. [1] at 7-8, [217].  It is undisputed that the '881 Patent was cancelled, and it is unclear how misleading the other statements were because the District Judge did not make a legal finding on this substantive claims of this issue.  However, although the Defendants prevailed and thus may have had the more meritorious position, there is no evidence that the Plaintiffs' FDUPTA claims were brought in bad faith.  Accordingly, the undersigned finds that the fourth factor weighs slightly in favor of the Defendants, as the Plaintiffs ultimately were not successful on any of their FDUPTA claims.

As to the sixth factor, there is no evidence that the Plaintiffs raised the FDUPTA claims to stall the proceedings, and thus this factor is neutral.

As to the seventh factor, whether the FDUPTA claim was brought to resolve a significant legal issue, there is no indication that the Plaintiffs brought the FDUPTA claim for this purpose, and thus, this factor is neutral.

Thus, three of the seven factors (one, two, and four), weigh in favor of the Defendants and the remaining factors are neutral or inapplicable.  As such, on balance, the factors weigh in favor of the Defendants and thus the undersigned finds that an award is warranted.  The Defendant did not dispute the Plaintiffs' contention that the attorney fee work recoverable for work on the FDUPTA claims only consisted of 36.8 hours for a total of $10,347.50.  Nor did the Defendants specifically dispute the Plaintiffs' challenges to some of the billing entries, ECF No. [290-3].  The undersigned has reviewed the Plaintiffs' challenges and, as discussed below, disagrees that the hourly rates sought by the attorneys are excessive.  Accordingly, the undersigned will not reduce the requested amount on that basis.  Further, to the extent that the Plaintiffs contend that

three entries for Vijay Brijbasi for the dates August 12, 13 and 14, 2013 were block billed, the Court finds that the time spent is reasonable, and based upon the award of the attorneys' fees, as discussed below, concludes that the time is compensable, in total.  As such, the undersigned will not deduct for block billing for those entries.  As to the contention that 7.9 of the hours for a total of $2,460.00 were not billed to the Defendants' clients, because the Defendants failed to respond to this challenge, the undersigned will deduct $2,460.00 from the entire attorneys' fee award.  Accordingly, the Defendants will be awarded fees for charges incurred for work performed in defending against Plaintiffs' FDUPTA claims in the total amount of $7,887.75.

## VI.  CALCULATING REASONABLE ATTORNEY'S FEES

### A.    The Lodestar Method

In calculating "reasonable" attorneys' fees, the Eleventh Circuit employs the lodestar approach.  *Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988).  Under this method, attorneys' fees are calculated by multiplying a reasonable hourly rate by a reasonable number of hours expended.  *See Gray v. Lockheed Aeronautical Sys. Co.*, 125 F.3d 1387, 1389 (11th Cir. 1997); *Cuban Museum of Arts & Culture, Inc. v. City of Miami*, 771 F. Supp. 1190, 1191 (S.D. Fla. 1991).  The Plaintiff bears the burden of documenting reasonable hours expended and reasonable hourly rates.  *ACLU v. Barnes*, 168 F.3d 423, 427 (11th Cir. 1999).  "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience and reputation."  *Norman*, 836 F.2d at 1299.  With respect to the issue of hourly rates, this Court "is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value."  *Id.* at 1303; *accord Tyler v. Westway Automotive Service Ctr., Inc.*, No. 02-61667-CIV, 2005 WL 6148128, at *2 (S.D. Fla. Mar. 10, 2005) (quoting *Loranger v.*

*Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994)). This Court must first determine whether the fee applicant has satisfied the burden of establishing that his requested hourly rates are reasonable.

        B.      <u>Reasonable Hourly Rates</u>

              1.      <u>Position of the Defendants</u>

The Defendants seek to be compensated for work performed by five attorneys who work at Roetzel & Andress at varying hourly rates, ECF NO. [285-2] at 3. Specifically, the Defendants seek to have Robert Pershes, Esq., compensated at an hourly rate of $400.00; Ronald Kopp, Esq., compensated at an hourly rate of $350.00; Vijay Brijbasi, Esq., and Ilona Kartus, Esq., at an hourly rate of $275.00; and, Jessica Lopez, Esq., at an hourly rate of $250.00.  In support of the hourly rates requested, the Defendants have submitted the Declaration of Vijay G. Brijbasi, an attorney at the law firm of Roetzel & Andress, LPA, who states, among other things, that the hourly rates sought in this action reflect the standard rate that Roetzel & Andress charges all of its clients for comparable litigation, ECF No. [285-2] at 2-3.[17]

The Defendants also seek to be compensated for Jamie Clark Dixon, Esq. an attorney with the law firm of Wadsworth Huott, LLP, at an hourly rate of $200.00, ECF No. [285-3] at 3, and to be compensated for the work performed by Bruce H. Wilson, Esq., at an hourly rate of $295.00.

In support of the requested hourly rates, the Defendants have included the biographies of the attorneys at Roetzel and Andress who performed work on this matter. The biography for Mr. Pershes reflects that he has been a partner at Roetzel & Andress since 2011, and prior to that served as a partner at Buckingham Doolittle & Burroughs

---

[17]  The Defendants have also cited and submitted to the Court portions of American Intellectual Property Law Association's AIPLA Report of the Economic Survey 2013 for anticipated damage ranges in a case of this nature, ECF No. [285-1].  The undersigned has not relied on the AIPLA Report in arriving at the determinations reached in this Report and Recommendation.

from 2002 until 2011 and a partner at Becker & Poliakoff between 2000 and 2002, ECF No. [285-2] at 70-71.  The biography further reflects that Mr. Pershes received his Juris Doctor in 1976, and his Masters in Law in 1980, both from New York University Law School.  The biography reflects that he is registered to practice before the United States Patent and Trademark Office, has been Board Certified in Intellectual Property since 2007, and has held a professional engineer license/certification from 1974 until the present.  In addition, Mr. Pershes is admitted to both the Florida and New York State Bar as well as the United States Supreme Court, the United States Courts of Appeals for the Second and Eleventh Circuits, and various other federal courts.

The biography of Ronald Kopp, Esq., reflects that Mr. Kopp obtained his law degree from The Ohio State University Law School in 1979, and is the Administrative Partner at Roetzel and Andress, where he has worked in the business litigation section since 1979, ECF No. [285-2] at 72.  Mr. Kopp has previously represented clients on intellectual property matters and is admitted to several federal courts including the United States Supreme Court, the United States Court of Appeals for the Federal Circuit Court and the United States Court of Appeals for the Eleventh Circuit.

According to his biography, Vijay Brijbasi, Esq., for whom the Defendants seek an hourly rate of $275.00, is an associate at Roetzel and Andress, who obtained his Juris Doctor from Nova Southeastern University, magna cum laude in 2005, ECF No. [285-2] at 75-76.  He previously served as the Senior Staff Attorney to the Florida Supreme Court. Mr. Brijbasi's practice focuses on complex commercial and intellectual property litigation and his biography reflects that he has litigated other patent infringement and copyright cases. He is admitted to the Florida Bar, the United States Court of Appeals for the Federal Circuit Court and the United States Court of Appeals for the Eleventh Circuit.

According to her biography, Ilona Katrus, Esq., for whom the Defendants seek an hourly rate of $275.00, obtained her Juris Doctor from the University of Cincinnati

College of Law in 2003 and focuses her practice on business banking, real estate and commercial lending, ECF No. [285-2] at 77.  She is admitted to practice in Florida, Ohio, District of Columbia, Indiana and Kentucky, as well as two Federal District Courts.

According to the biography of Jessica Lopez, Esq., for whom the Defendants seek an hourly rate of $250.00, she obtained her Juris Doctor, magna cum laude, and her LLM in Intellectual Property, magna cum laude, from the University of Akron in 2013, ECF No. [285-2] at 79.  Her practice focuses on business and commercial litigation and intellectual property, with an emphasis on trademarks.

The Defendants have also provided the resume of Jamie Clark Dixon, Esq., in support of their hourly request of $200.00 , ECF No. [295-3] at 87.  The resume indicates that Mr. Dixon obtained his Juris Doctor in 2004, and is admitted to the United States Court of Appeals for the Federal Circuit Court and the United States District Court for the Southern District of Florida.

In support of the Plaintiffs' request for an hourly rate of $295.00 for Bruce H. Wilson, Esq., Mr. Wilson has submitted a Declaration wherein he refers the Court to his Motion for Pro Hac Vice filed earlier in the case, as demonstrating his qualifications and education, ECF Nos. [285-4], [28].  In that Motion, Mr. Wilson, an attorney at the Ohio law firm of Bruce H. Wilson, Esq., states that he is not admitted to practice in the Southern District of Florida, but is admitted to practice in the State of Ohio, the United States District Court of the Northern District of Ohio, and the Court of Appeals for the Federal Circuit.

2.        Position of the Plaintiffs

In response to the Defendants' requested hourly rates, the Plaintiffs have objected to the hourly rates sought by Vijay Brijbasi, Esq., of $275.00, Ilona Katrus, Esq., of $275.00 and Jessica Lopez, Esq., of $250.00, as excessive, ECF No. [290] at 15.   The Plaintiffs have not objected to the other hourly rates requested by the Defendants.  In

support of their position, the Plaintiffs have submitted the Affidavit of Travis R. Hollifield, Esq., the managing partner at Hollifield Legal Centre, and an adjunct professor of law in, among other things, intellectual property at Barry University, ECF No. [290-4].   Mr. Hollifield states in the Affidavit that he has considered the education and experience of the Attorneys who represented the Defendants in this case, and concludes that the rates of Vijay Brijbasi, Esq., Ilona Kartus, Esq., and Jessica Lopez, Esq., are excessively high. Mr. Hollifield suggests that the hourly rate awarded to Mr. Brijbasi and Ms. Katrus should be $225.00, and that the hourly rate for Ms. Lopez should be $200.00.

### 3.   Analysis

The Court is "an expert on the question [of attorney's fees] and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Norman v. Housing Authority of the City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir.1988) (quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir.1940)).   A reasonable hourly rate is one that is adequate to attract competent counsel in the relevant legal market, but does not produce a windfall to that attorney. *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir.1988) citing *Blum v. Stenson*, 465 U.S. 886, 894–95,  (1984). Generally, "the 'relevant market' for purposes of determining the reasonable hourly rate for an attorney's services is 'the place where the case is filed.' " *ACLU of Ga.*, 168 F.3d at 437 (citing *Cullens v. Ga. Dep't of Transp.*, 29 F.3d 1489, 1494 (11th Cir. 1994)). The relevant market for purposes of this case, therefore, is the South Florida legal community.  This patent infringement case involved complex issues, and somewhat novel issues given the prior litigation between the parties and the issuance of a reexamined patent.  Based upon the materials provided by the Defendants and an independent review of the record as a whole, the undersigned concludes that the hourly rates requested by the Defendants for all of the attorneys are reasonable and in line with

those charged in the South Florida legal community.  As such, the Plaintiffs' objections to the hourly rates of Vijay Brijbasi, Esq., and Ilona Kartus, Esq., of $275.00, and Jessica Lopez, Esq., of  $250.00 are overruled.

### C.    Reasonable Hours Expended

#### 1.    Framework for Analysis

A party seeking attorneys' fees must supply detailed evidence of the hourly rates and time expended so that this Court may properly assess the time claimed for each activity. *Norman*, 836 F.2d at 1303.  Counsel must use "billing judgment" and exclude "excessive, redundant, or otherwise unnecessary" hours from any fee petition, *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983), "irrespective of the skill, reputation or experience of counsel."  *Barnes*, 168 F.3d at 427.  Though the fee applicant bears the initial burden of submitting evidence sufficient to allow the court to confirm that the requested fees are not excessive, "objections and proof from fee opponents concerning hours that should be excluded must be specific and reasonably precise."  *Id.* at 428 (quoting *Norman*, 836 F.2d at 1301) (internal quotations omitted).

#### 2.  The Challenged Time Entries

The Plaintiffs have challenged the hours sought by the Defendants as unreasonable and non-compensable on a number of grounds.  At the outset, the undersigned notes that many of the objections to the Defendants' attorneys' fees request relate to billing entries that occurred prior to the Court's Order on Claims Construction that was issued on July 16, 2013, ECF No. [178].  However, as discussed at length above, the undersigned has concluded that it was not until the Court issued its ruling on the Claims Construction that the Plaintiffs' continued pursuit of the infringement claims on the reexamined patent became frivolous and lacking in objective reasonableness.  As such, any of the Plaintiffs' objections to the Defendants' attorneys' fees incurred prior to

that time are moot.[18]  The undersigned addresses each of the remaining challenges, in turn.

### Time Resulting from Duplication of Efforts

The Plaintiffs first challenge the Defendants number of hours as being unreasonable because, according to Plaintiffs, the Defendants seek compensation for the presence of more than one attorney at multiple in-office conferences, hearings and depositions even though Defendants fail to demonstrate that the presence of additional counsel was helpful or even necessary, ECF No. [290] at 17. The Plaintiffs seek a reduction of 590 hours from the Defendants' submitted billing hours for a total reduction of $169,625.00 from the amount requested by the Defendants.

In response, the Defendants contend that the Plaintiffs have failed to explain which entries were unreasonable or redundant, ECF No. [293] at 6.  The Defendants further contend that it is difficult to frame a response to the Plaintiffs' conclusory argument and state that each of the Defendants' attorneys played a distinctive role in the defense of the Plaintiffs' claims.

Redundant hours generally occur where more than one attorney represents a client. There is nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer. *Norman v. Housing Authority of City of Montgomery,* 836 F. 2d 1292, 1301-02 (11th Cir. 1988) (citing *Johnson v. University College of University of Alabama in Birmingham*, 706 F.2d 1205, 1208 (11th Cir.1983)).  An award for time spent by two or more attorneys is proper as long as it

---

[18] The undersigned has considered that the District Judge may determine that the Plaintiffs' pursuit of this action was frivolous at the inception of this action and thus find that the Defendants are entitled to attorneys' fees from the moment they began defense of this action.  If the Court makes such a determination, the undersigned's ruling regarding the Plaintiffs' objections to Defendants' attorneys' fees incurred prior to the issuance of the Court's Claims Construction Order will be reconsidered, if necessary.

reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation. *Id.* (citation omitted). Thus, a fee applicant is entitled to recover for the hours of multiple attorneys if he satisfies his burden of showing that the time spent by those attorneys reflects the distinct contribution of each lawyer to the case and is the customary practice of multiple-lawyer litigation. *Id.*

In support of their request for a reduction, the Plaintiffs have submitted Exhibit F, which is comprised of thirty-five pages of billing entries culled from the Defendants' billing records which Plaintiffs contend demonstrate the improper multiple billing by attorneys for performing the same work, ECF No. [290-6].[19] The undersigned has thoroughly reviewed of the Plaintiffs' submissions on this point. Based thereon, it appears that in an effort to demonstrate which of the Defendants' attorney bills improperly include billing for multiple attorneys performing the same work, the Plaintiffs simply submitted every entry by one of the Defendants' attorneys wherein a reference was made to a teleconference, a court hearing or other entry in which other Defense attorneys were identified. Plaintiffs have suggested that the entire entry for that particular attorney be deducted.

However, the Plaintiffs have failed to provide the Court with any type of detailed explanation or analysis of the improper billings for the entries on the thirty-five page exhibit and further failed to explain why the entire entry in the exhibit should be disallowed. For example, the Plaintiffs have included in the Exhibit a billing entry for Ronald Kopp for August 22, 2013, wherein Mr. Kopp billed 4.60 hours for "Teleconferences with Bruce Wilson, Jamie Dixon and Bob Pershes regarding briefing, samples and related issues, continued work on briefing," ECF No. [290-6] at 6. Plaintiffs apparently contend that this entry represents improper, duplicative billing for multiple

---

[19] The Plaintiffs have identified entries that fall into this category as "Category 6", ECF No. [290-6] and [290-4] at 12-46.

attorneys.  However, a review of the corresponding billing entries for Attorneys Wilson and Pershes for that same date, do not reflect the teleconferences identified by Mr. Kopp. The Plaintiffs have not stated otherwise and have not directed the Court to where the actual duplicative billing entries are located.  The Court notes, however, that Mr. Dixon's billing records for August 22, 2013, consist of four different entries which totaled 1.2 hours including .5 of an hour for communicating with Mr. Kopp regarding Defendants' product samples, and two entries for .3 for drafting and revising electronic correspondence to Attorneys Kopp and Pershes regarding samples, ECF No. [285-3] at 78-79.  Thus, to the extent Mr. Dixon has double billed the amount, it appears that the only double billing for that day by multiple attorneys, if any, was for 1.2 hours, not the entire 4.60 hours that Plaintiffs suggest be deducted.

Similarly, the Plaintiffs have fail to suggest the appropriate amount to be deducted for multiple attorneys performing the same work, but rather have simply subtracted in toto those entries from the Defendants' requested attorneys' fees.  For example, the July 30, 2013 billing entry for Robert Pershes which was submitted by the Plaintiffs is for 5.00 hours and includes Mr. Pershes review and organization of photos, as well as, "emails to Kopp and emails to Santucci re: discovery issues." ECF No. [290-6] at 5.  However, the two corresponding entries for Mr. Kopp for July 30, 2013, only reflect 3.6 hours billed for telephonic conferences (1.7) and emails and telephone calls from opposing counsel and Mr. Pershes (1.9).  Thus, it is improper to deduct the entire 5.0 hours suggested by Plaintiffs, as there was no duplicative billing for 1.4 hours, if at all.

In addition, there are several entries included on the exhibit submitted by Plaintiffs which purportedly illustrate improper multiple billing that don't reflect that work was done by two of the Defendants' attorneys.   As to those entries, the Plaintiffs have failed to direct the Court to which attorneys supposedly both billed for the work at issue, and as such, the Court is unable to assess whether reduction should be made. However,

although it does appear that multiple attorneys for the Defendants did appear at various Court hearings, the Plaintiffs have failed to provide the Court with any specific dates or suggested reductions based on the number of hours billed by the Defendants for those hearings.  Simply put, because the Plaintiffs' submission is overly inclusive and fails to provide any details as to the billing entries at issue or identify the corresponding duplicative entries, it is nearly impossible for the Court to determine whether a reduction should be made based upon multiple billing, and, if so, what an appropriate reduction for those entries would be.  Based upon the extraordinarily contentious nature of this litigation, it was necessary for multiple attorneys to be involved and to keep each other abreast of developments.  The undersigned was unable to discern any unreasonable or unnecessary redundancy.

On this issue, the undersigned is aware that Mr. Hollifield in his Declaration, opines that the Defendants have improperly billed for work performed by multiple attorneys, ECF No. [290-4].  However, the Declaration fails to provide any specific information regarding the billing entries at issue, in a manner in which the Court is able to analyze those entries and craft an appropriate reduction.  To the extent that Mr. Hollifield identified duplicative billing with any degree of specificity, those entries pre-dates the July 16, 2013 starting date that the undersigned has found appropriate.   A fee opponent's failure to explain with specificity the particular hours he views as unnecessary or duplicative is generally fatal. *Gray v. Lockheed Aeronautical Systems Co.*, 125 F.3d 1387 (11th Cir. 1997); *Scelta v. Delicatessan Support Srvcs. Inc.*, 203 F. Supp. 2d 1328, 1333 (M.D. Fla. 2002).

Accordingly, the undersigned declines to reduce the Defendants' requested hours based upon the purported multiple billings by the Defendants' attorneys.  To the extent there was any multiple billing, based upon a review of the record, the undersigned finds

that it was necessary for the coordination of tasks and the defense of this action by multiple attorneys.

***Time Resulting from Excessive Billing***

The Plaintiffs next contend that the Defendants billed excessively for drafting motions, reviewing documents and engaging in activities by multiple attorneys, ECF No. [290] at 17.  The Plaintiffs request that the Court reduce the Defendants' entries by 194.1 hours for a total reduction of $61,017.50.  In support of this request, the Plaintiffs again rely on the Declaration of Travis Hollifield wherein Mr. Hollifield states that Defendants' attorney Mr. Pershes excessively billed for review of product samples, and Mr. Dixon billed excessively for the revision of email correspondence, docket entries, discovery and motions, ECF No. [290-4] at 9.[20]  The Plaintiffs have submitted a list of the entries at issue, but do not provide any specific analysis as to those entries, ECF No. [290-7].

In response, the Defendants argue that Plaintiffs have failed to adequately explain their arguments regarding their objections and further assert that Plaintiffs fail to suggest an appropriate reduction rather than seeking to have the entire billed amount disallowed, ECF No. [293].

The undersigned agrees.  The undersigned has reviewed the billing entries at issue and concludes that the Plaintiffs have failed to adequately identify what is excessive in the particular entries.  That aside, the undersigned finds that the entries are not excessive on their face, based upon the complex and contentious nature of this litigation.  Counsel for the Defendants, Mr. Pershes billed 16.8 hours for reviewing product samples in this case.  The case at bar involves claims of patent infringement related to a patent held by the Plaintiffs that includes twenty-eight claims in a re-examined patent.  At issue in the case were no fewer than twenty-six different products

---

[20] The Plaintiffs have referred to this category as "Category 9", ECF Nos. [290-4] at 47-50 and [290-7] at 2-5.

48

manufactured and/or distributed by the Defendants in various colors, sizes and configurations which the Plaintiffs contended infringed upon the reexamined patent. Although most, if not, all of the products at issue related to synthetic teak boat decking, the technological and mechanical properties of the Defendants' products in comparison to the patent was sufficiently complex enough to require the Court to hold a technology tutorial, ECF No. [141].

Further, the docket entries related to the review of the samples by Mr. Pershes reflect that the products were reviewed in conjunction with preparation for the filing of, and responding to, summary judgment motions, and in preparation for providing those samples to the Court after the Court granted the Parties' Motions to Furnish Judge with Samples in conjunction with ruling on the Motions for Summary Judgment, ECF No. [246].  As such, the undersigned concludes that the time Mr. Pershes spent inspecting the samples was not excessive.

Accordingly, the undersigned finds that the challenges presented by the Plaintiffs lack the detail to enable to Court to make a determination as the validity of the challenges and an appropriate reduction of the billing entries.   As such, the Court will not reduce the hours as requested by the Plaintiffs.[21]

### *Vague Billing Entries*

The Plaintiffs have contended that a number of the Defendants' billing entries are vague and have suggested that the Court should either deny the request for these hours in toto, or in the alternative, reduce the requested amount by 50%, ECF No. [290] [290-8]. In response, the Defendants state that the entries at issue are actually entries that have

---

[21]  Although the undersigned is aware that when the number of hours involved is very high, the Court can decide that an hour-by-hour analysis is impractical, and instead apply an across the board reduction, *See, e.g., St. Fleur v. City of Fort Lauderdale*, 2005 WL 2077742, *4 (11th Cir. August 29, 2005), in this case, the Plaintiffs have failed to identify and present their challenges in a manner in which the undersigned is able to determine whether a reduction is even warranted.

been redacted, ECF No. [293] at 7.  The Defendants, however, do not oppose a 50% reduction of these fees.

After reviewing the entries, the undersigned concludes that the requested fees should not be denied in toto, but that some reduction is appropriate.  Therefore, considering the Plaintiffs' unopposed alternative position, the undersigned recommends reducing the requested $38,675.50 requested by Defendants by 50% to $19,337.75.

### Time Entries Necessitated by Conduct of Defendants

#### a.  Time Billed Prior to Claims Construction Order

The Plaintiffs have challenged certain of the Defendants' billing entries as being necessitated by the unnecessary conduct of the Defendants, ECF No. [290] at 18.  However, as stated above, the Defendants are not entitled to recover attorneys' fees incurred for work performed prior to the Claims Construction Order on July 16, 2013.  Thus, the Plaintiffs' objections to the Defendants' cancellation of depositions scheduled in Ohio in April 8-12, 3013, ECF No. [290] at 19, ECF No. [290-10][22]; objections to work done on the Markman briefs that were stricken, ECF No. [290] at 22, ECF No. [290-15]; objections to time necessitated by communications and interactions which involved Dr. Halasa and Dr. Isayev, ECF No. [290] at 21, ECF No. [290-13]; objections to the times spent on the doctrine of intervening rights, ECF No. [290] at 21, ECF No. [290-14]; objections to time spent with attorneys who were not of record in this case, ECF No. [290] at 22, ECF No. [290-16]; and objections to time for things that were never filed, ECF No. [290] at 22, ECF No. [290-17], are denied as moot, because all of the billing entries for

---

[22] There are thirteen billing entries identified by Plaintiffs in this category that reflect work performed after July 16, 2013, that total $8,257.00, ECF No. [290-10] at 5.  However, it is unclear to the undersigned how those entries relate to the issue of the depositions cancelled in April, and the Plaintiffs have failed to provide any explanation for the inclusion of these entries.  Accordingly, the undersigned concludes that a deduction for these entries for the cancelled depositions is not appropriate.

those items correspond to work performed prior to the date that the Order on Claims Construction was issued.

### b. Fees Based on Substitution of Counsel

Plaintiffs assert that the Defendants unnecessarily incurred additional attorneys' fees when the Defendants decided to change counsel from Attorneys Bruce Wilson, Esq. and Jamie Clark Dixon, Esq., to the law firm of Roetzel and Andress, ECF No. [290] at 18. Plaintiffs refer to these challenges as Category 7, and have provided a print-out of the billing records which Plaintiffs contend reflect the unnecessary charges, ECF No. [290-9].

In Response, the Defendants contend that the Law Firm of Roetzel and Andress did not enter the case as substitute counsel for Mr. Wilson and Mr. Dixon, but rather joined the case to supplement the appearances already made by those two attorneys, ECF No. [293] at 7.

The undersigned has reviewed the Plaintiffs' submissions on this issue and finds that, like many of the Plaintiffs' submissions for the other objections, the billing entries submitted fail to demonstrate the exact entries to which the Plaintiffs object.  Although five of the thirty pages submitted by Plaintiffs reflect billing entries for the Roetzel and Andres Law Firm, the remaining entries are the billing entries for Jamie C. Dixon, Esq., from February 1, 2013 through November 27, 2013, and for Bruce Wilson, Esq., from March 22, 2013 through October 4, 2013, ECF No. [290-9].  Thus, it is unclear why Plaintiffs view many of the entries as reflecting the Defendants' decision to change counsel as opposed to billing entries related to Mr. Wilson's and Mr. Dixon's co-representation of the Defendants with the Law Firm of Roetzel and Andress.  For example, many of the September 2013 entries for Mr. Dixon relate to the motions for summary judgment briefing, and occurred more than six months after the law firm of Roetzel and Andress began its co-representation of the Defendants.  While the entries may mention co-counsel in the description of the task, that still does not explain why

those entries reflect excessive billing due to Defendants' decision to "substitute" counsel.  Thus, because the Plaintiffs have failed to direct the Court to which entries are purportedly objectionable, other than providing a print-out of billing entries where co-counsel is included in the description, and have failed to demonstrate that those entries reflect excessive billing, the undersigned recommends that Plaintiffs' objections on this basis be overruled.

### c. Billing Entries Related to Discovery Disputes

The Plaintiffs also assert that the Defendants should not recover attorneys' fees incurred in defending against Plaintiffs' efforts to compel the Defendants to produce certain discovery, ECF No. [290].  The Plaintiffs have submitted billing entries, identified as category 1, that Plaintiffs purport represent time that should be excluded from the Defendants' attorneys' fees due to the Defendants' failure to produce the discovery, ECF No. [290-11].

In response, the Defendants contend that it was the Plaintiffs' "gamemanship" in the discovery process that necessitated the additional attorneys' fees related to discovery, ECF No. [293].

The undersigned has thoroughly reviewed the billing entries submitted by the Plaintiffs for this category of objections, as well as the undersigned's discovery orders in this case, and the docket as a whole.  Based thereon, the undersigned concludes that the Plaintiffs' objections on this point should be overruled.  First, as discussed above, to the extent any of the billing entries involve conduct occurring prior to the Court's Claims Construction Order issued on July 16, 2013, the Defendants are not entitled to recovery in any event, and thus those challenges are moot.  As to the remaining billing entries cited by Plaintiffs, the Plaintiffs have failed to establish, and the record does not support a finding that those fees were incurred as a result of the Defendants' improper behavior during the course of discovery.  Although many of the entries reflect that much of the

discovery that the Parties engaged in after the July 16, 2013 date, related to the production of the Defendants' samples, under the circumstances of this case, and the undersigned's finding that the case was frivolous after the Court issued its Order on Claims Construction, fees incurred in defending this action after that point are recoverable.  The undersigned is aware that any award of fees has to be reasonable and should not be the result of improper conduct on the part of the Defendants, but the Plaintiffs have not pointed to any specific billing entry after July 16, 2013 which reflects improper conduct on the part of the Defendants with regard to the production of samples or other discovery.  In this regard, the undersigned notes that throughout this contentious litigation both Parties asserted that the opposing had failed to appropriately respond to discovery.  In addition, in the Order on the Plaintiffs' Motion for Sanctions, ECF No. [253], based upon this same discovery conduct at issue in the Plaintiffs' objection, the undersigned denied the Motion on a number of grounds including the Plaintiffs' failure to timely request the production of certain samples, and to adequately identify which products the Plaintiffs sought, ECF No. [253].  Further, given that the Plaintiffs' Motion for Sanctions was denied, the Defendants are entitled to recover their attorneys' fees incurred in defending against that Motion.  As such, the undersigned recommends that the Plaintiffs' objection on this point be denied.

### d. Time Spent for Alvin Rockhill

The Plaintiffs contend that the Defendants are not entitled to recover Attorneys' Fees incurred in communicating and interacting with Alvin Rockhill, the Defendants' prior patent attorney, ECF No. [290] at 20.  The Plaintiffs assert that because Mr. Rockhill was designated as an expert for the Defendants but was not listed as a witness for the Markman hearing and did not appear at the Technology Tutorial that fees incurred related to his involvement in this case should be excluded from any award.

In response, the Defendants contend that the Defendants intended to call Alvin Rockhill as an expert in this case, ECF No. [293], and that this representation is confirmed by the Defendants' Notice of Compliance which was filed on August 9, 2013, ECF No. [185].

Again, the undersigned has already determined that the Defendants are not entitled to recover any fees incurred prior to July 16, 2013, and thus any fees in this category incurred prior to that date should be excluded. The billing submissions from the Plaintiffs in this category reflect that the Defendants' Attorneys billed for approximately $4,140.60 for work performed related to Mr. Rockhill after that date, although at least one billing entry reflects that work was also performed on the summary judgment motion during that time. Based upon a thorough review of the record, the undersigned finds that the Plaintiffs' objection on this issue has no merit, particularly in light of the Notice of Compliance filed by the Defendants on August 9, 2013, which indicates that Mr. Rockhill would be called as an expert at trial, ECF No. [185]. The fact that this matter was resolved in favor of the Defendants at the summary judgment stage does not prevent the Defendants from recovering attorneys' fees incurred related to an expert witness who would have been called at trial, if necessary. As such, the undersigned will not deduct attorneys' fees on this basis.

### 3.   Hours Billed by Paralegals

The Plaintiffs challenge 176.7 hours billed by Roetzel and Andress for paralegals at an hourly rate ranging between $135.00 to $150.00, ECF No. [290] at 23. The Plaintiffs contend that some of the billing entries for the paralegals contain improper block billing and include non-compensable clerical activities. The Plaintiffs request that the Court cut the paralegal billing entries by 30% but fail, however, to specifically identify the entries at issue.

In response, the Defendants contend that the hours billed by the paralegals saved money because the work performed by the paralegals otherwise would have been performed by an attorney at a higher hourly rate, ECF No. [293] at 11.

Pursuant to Eleventh Circuit case law, paralegal work is compensable "to the extent that the paralegal performs work traditionally done by an attorney." *Jean v. Nelson*, 863 F.2d 759, 778 (11th Cir. 1988) (*quoting Allen v. United States Steel Corp.*, 665 F.2d 689, 697 (5th Cir. 1982)). Where that is not the case, paralegal work is viewed as falling within the category of unrecoverable overhead expenses. *Allen*, 665 F.2d at 697. "Work traditionally done by an attorney" includes "factual investigation, including locating and interviewing witnesses; assistance with depositions, interrogatories, and document production; compilation of statistical and financial data; checking legal citations and drafting correspondence." *Securities and Exchange Comm'n, v. Kirkland,* 2008 WL 5191230 *2 (M.D. Fla. 2008) citing *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989), but not "work that is purely clerical in nature, such as contacting court reporters, and mailing, filing, and delivering documents. . ." *Id.* The focus of the inquiry is whether the work is the type traditionally performed by attorneys.

The undersigned has reviewed, on a random sample basis, several of the entries billed by Roetzel and Andress paralegal, Jennifer Bordner, and concludes that while some of the work performed by Ms. Bordner is of a legal nature, *e.g.* "Draft Request for Oral Argument and Affidavit," "Draft Notice of Withdrawing Motion," some of the entries are clerical in nature, e.g., "Receipt of additional documents produced," "Finish depo transcript binder", ECF No. [285-2] at 38, 43, 47, 48. However, it appears that the bulk of the entries for Ms. Bordner involve non-clerical work. Accordingly, Ms. Bordner's fees should be reduced by 10% to reflect those entries that primarily involve clerical work. The undersigned therefore recommends that Ms. Bordner's fees totaling $22,605.00 representing 150.7 hours at an hourly rate of $150.00, be reduced by $2,260.50, (or 10%)

for a total award of $20,344.50 for Ms. Bordner.  Similarly, the undersigned recommends that the work performed by the other paralegals in the amount of $3,598.00 be reduced by $359.80  (or 10%) to $3,238.20.

### 4.    Calculating the Lodestar

Thus, after making the appropriate reductions in the relevant hourly rates and the number of hours expended, the lodestar equals $211,514.45 based on the following amounts calculated from attorneys' fees incurred after the Order on Claims Construction issued on July 16, 2013.  The undersigned has considered the record as a whole and the work performed, as reflected on the docket and in the hearings held after July 16, 2013, and finds that this total award constitutes a reasonable fee award under the totality of the circumstances:[23]

| Firm/Attorney | Total Amount of Award | Billing Dates |
|---|---|---|
| Roetzel and Andress ($198,952.50 less $2,620.30 for paralegal work) | $196,332.20 | 7/17/2013-10/31/2013 |
| Jamie Dixon | $28,620.00 | 7/17/2013-11/27/2013 |
| Bruce H. Wilson | $5,900.00 | 7/19/2013-10/4/2013 |
| Lodestar Amount of Attorney's Fees (Calculated from 7/17/2013): | $230,852.20 | |
| Amount Deducted for Vague Entries: | - $19,337.75 | |
| **TOTAL AMOUNT OF ATTORNEYS' FEE AWARD:** | **$211,514.45** | |

---

[23] The Court has also reviewed  the hourly rate and attorney time for reasonableness based on the 12 so-called "*Johnson* factors," including (1) the time and labor required, (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1340-41 (11th Cir. 1999) (citing *Johnson,* 488 F.2d at 717-19).

## VII. <u>BILL OF COSTS</u>

The Defendants, as a prevailing party, have also filed a Bill of Costs seeking to recover costs in the total amount of $4,741.48 for costs incurred in this matter.  Rule 54(d) of the Federal Rules of Civil Procedure states that prevailing parties are entitled to costs "unless a federal statute, [the federal rules of civil procedure], or a court order provides otherwise."  As a result, "there is a presumption that the prevailing party will be awarded costs." *Mathews v. Crosby*, 480 F.3d 1265, 1276 (11th Cir. 2007).  However, any costs awarded by a court pursuant to Rule 54(d) may not exceed the parameters of 28 U.S.C. § 1920. *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987).

Section 1920 provides:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursement for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under Section 1923 of [Title 28]; and

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under Section 1828 of [Title 28].

28 U.S.C. § 1920.

If the losing party challenges the requested costs, he has the burden of showing that the costs are not taxable unless "the knowledge regarding the proposed cost is within the exclusive knowledge of the prevailing party." *Monelus v. Tocadrian, Inc.*, 609 F. Supp. 2d 1328, 1333 (S.D. Fla. 2009).

Based upon a review of the record, including the objections raised by the Plaintiffs, for the following reasons, the undersigned concludes that the Defendants are entitled to recover costs in the amount of $4,471.48 less $253.08, for a total of $4488.40.[24]

### Fees for the Clerk and for Service of Summons and Subpoena

Defendants seek to recover the Fees of the Clerk totaling $75.00. The Defendants also seek the recover fees for service of summon and subpoena in the amount of $349.00. Although the Plaintiffs originally objected to the Defendants' request for costs based upon the Defendants' purported failure to provide documentation to support the request, the Plaintiffs have subsequently withdrawn the objection on this basis, ECF No. [294]. Thus, Plaintiffs have not lodged an objection as to the Defendants' request for costs associated with the Fees of Clerk and for Service of summons and subpoena. These cost falls within § 1920's entitlement to costs and the Defendant raises no objection. *Evans v. Tenn. Dep't of Corrections*, 514 F.2d 283, 284 (6th Cir. 1975) (finding that the filing fee and fees for service of process were properly included in a bill of costs). Accordingly, the Court finds that $75.00 in filing fees and $349.00 in fees for service of summons and subpoena should be granted.

### Fees for Transcripts Necessarily Obtained for Use in the Case

Defendants seek $1,937.48 for costs associated with deposition and hearing transcript fees, ECF Nos. [275], [275-1]. The Plaintiffs have contended that the transcripts of the status conferences, including the July 26, 2013 status conference, were not necessary and thus are not compensable. The undersigned agrees that the transcript for the July 26, 2013 status conference was not necessary particularly given that the Order for that status conference issued almost immediately thereafter. Therefore the undersigned will deduct the $253.08 from the Defendants' cost incurred in obtaining

---

[24] Unlike the Court's limitation on the date in which the Defendants were entitled to recover attorneys' fees, the Defendants are entitled to recover costs as a prevailing party from the inception of the case so long as those costs are enumerated in § 1920.

that transcript, ECF No. [275-1] at 9.  However, the Plaintiffs' other objections in this category again lack the specificity to determine which of the other hearing transcripts the Plaintiffs contend were not necessary. In addition, the Plaintiffs fail to specifically state why the transcripts were not necessary, particularly given that in several of the hearings, the Court gave oral directives to the Parties.

Accordingly, the undersigned concludes that the Defendants are entitled to recover their costs for transcript in the amount of $1,684.40 representing a $253.08 deduction for the July 26, 2013 transcript from the status conference before the District Judge.

### Fees for Exemplification and Costs of Copies Necessarily Obtained for Use in the Case

The Defendants have sought to recover costs in the amount of $2,380.00 incurred in copying various items for the Court including summary judgment motions and materials, claims construction materials and exhibits for use at the Technology Tutorial, ECF No. [285].  The Plaintiffs only raised a specific objection to the request for costs incurred in copying Markman briefs, which were stricken by the Court, ECF No. [290] at 24.  The Plaintiffs contend that those copies therefore were not necessary to the resolution of this case.

The undersigned disagrees and instead concludes that the requested copy costs, including those for the stricken Markman briefs, fall within those specified in §1920.  As such the Defendants are entitled to recover $2,380.00 in cost incurred for necessary copies.

VIII.   CONCLUSION

Therefore, for the reasons stated above, and upon a review of the record as a whole, it is hereby

RECOMMENDED that Defendants' Verified Renewed Motion for Attorneys' Fees and Costs, ECF No. [285] be GRANTED, in part, and Defendants be granted reasonable attorneys' fees incurred as of July 17, 2013, in the total amount of $211,514.45. It is further

RECOMMENDED that Defendants be awarded $4,488.40 of the costs sought in the Defendants' Amended Bill of Costs, ECF No. [273].

The Parties will have until February 18, 2016 within which to file written objections to this Report and Recommendation, if any, for consideration by the United States District Judge to whom this case is assigned. Any response to objections shall be filed within seven (7) calendar days thereafter. Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Resolution Trust Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND ORDERED in Miami, Florida, in chambers, on February 4, 2016.

*Andrea M. Simonton*

**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished via CM/ECF to:
The Honorable Patricia Seitz,
        United States District Judge
All counsel of record